Filed 4/28/14

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)       S049741
      v. )
)
WILLIAM LESTER SUFF, )
)       Riverside County
      Defendant and Appellant. )   Super. Ct. No. CR 44010
_____)

A jury convicted William Lester Suff of the first degree murders of Kimberly Lyttle, Tina Leal, Darla Ferguson, Carol Miller, Cheryl Coker, Susan Sternfeld, Kathleen Milne (also known as Kathleen Puckett), Sherry Latham, Kelly Hammond, Catherine McDonald, Delliah Zamora (also known as Delliah Wallace), and Eleanor Casares (Pen. Code, §§ 187, subd. (a), 189), and one count of attempted murder of Rhonda Jetmore (Pen. Code, §§ 664, 187).[1] The jury found true the special circumstance allegations that defendant was convicted of more than one offense of murder in this proceeding, and that defendant intentionally killed each of the homicide victims while lying in wait. (§ 190.2,

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The jury deadlocked with respect to a charge of first degree murder of Cheri Payseur, and the court declared a mistrial as to that count.

1

subd. (a)(3), (15).)  The jury also found true the allegations that defendant personally used a deadly and dangerous weapon, a knife, within the meaning of sections 12022, subdivision (b) and 1192.7, subdivision (c)(23), in the commission of the murders of Leal, Miller, Coker, McDonald, and Casares.  After defendant waived his right to a jury trial on the special circumstance allegation that he had suffered a prior conviction for murder, the trial court found the allegation to be true.  (§ 190.2, subd. (a)(2).)

Following the penalty phase of the trial, the jury returned verdicts of death with respect to each of the 12 murder convictions.  The trial court denied defendant's application to modify the death penalty verdict to life imprisonment without the possibility of parole (§ 190.4, subd. (e)), and sentenced defendant to death with respect to each of the 12 murder convictions.  The court also sentenced defendant to life with the possibility of parole with respect to the attempted murder conviction, and to a total of five years with respect to the findings that he personally used a deadly and dangerous weapon in the commission of five of the murders.  This appeal is automatic.  (§ 1239, subd. (b).)  We affirm the judgment.

## I.  FACTS

### A.  Guilt Phase Evidence

#### 1.  Prosecution case

Defendant's victims abused drugs and worked as prostitutes in Riverside County.  The homicide victims were killed between June 1989 and December 1991.  All of his victims were asphyxiated, four of the victims also suffered stab wounds to the chest, and the right breast of three of the victims had been excised.  Hairs, fibers, tire tracks, and shoe impressions connected defendant with the homicide victims, and each of these types of evidence was associated with more than one victim.  The victim of the attempted homicide identified defendant as her

2

assailant, and a friend of homicide victim Kelly Hammond identified defendant as the person driving a van that Hammond entered the evening she disappeared. A knife found in defendant's van had blood on it that was consistent with the last homicide victim's and not consistent with defendant's. Testing of DNA found on or near nine victims reflected matches to defendant. Personal items belonging to three of the homicide victims were found at defendant's worksite, in his wife's jewelry box, and in the possession of acquaintances to whom he had given them. Defendant had repeatedly expressed his hatred of prostitutes, and had stated to one person that he thought that prostitutes should be killed.

### a. Attempted murder of Rhonda Jetmore

In January 1989, Rhonda Jetmore was seated on a bench on Main Street in the City of Lake Elsinore (Lake Elsinore), "hoping to encounter a date." A man drove a station wagon alongside the curb near where she was sitting, and confirmed that he was looking for a "date." He moved a box containing files of papers from the front passenger seat to the backseats, where there were more papers, and she entered his vehicle. He told her his name was "Bob," they agreed on a price of $20 for "straight sex," and she directed him to a nearby vacant residence. Once inside, Jetmore requested prepayment for her services. The man handed her a bill and, using her flashlight, she determined it was a single dollar. Before she could say anything, he grabbed her around her neck with both hands, pushed her down, and began choking her. As he choked her, she looked at his face, and also noticed his belt buckle, which had "Bill" spelled on it. She felt she was losing consciousness, and she believed he was attempting to kill her. When she realized she still had her flashlight, she struck him with it on the side of his head, and he released his grip on her neck. They struggled as she attempted to escape, and his eyeglasses, which had a wire or metal frame, came off. Her

3

assailant agreed to let her leave if she assisted him in finding his glasses. She spotted them with her flashlight, and escaped as he retrieved them.

She did not report the assault until she was contacted later in January 1989 by the Riverside County Sheriff's Department regarding a different matter. She informed a sheriff's deputy of the name on the belt buckle, and of her perception that the assailant had responded when she called him "Bill." When she was contacted again in 1992 by the sheriff's department, she selected defendant's photograph from a group of six photographs, and she recalled that he drove a light-colored station wagon. She identified defendant at trial, and stated she had no doubt that he was her assailant.

At the time of the attack on Jetmore in January 1989, defendant was living with Bonnie Ashley in Lake Elsinore. Ashley identified defendant in photographs in which he was wearing wire-rimmed glasses and a belt buckle with the name "Bill" on it. She kept real estate documents and other papers in her vehicle, and defendant sometimes drove her vehicle, which was a white station wagon.

### b. Murder of Kimberly Lyttle

Kimberly Lyttle worked on Main Street in Lake Elsinore. On June 28, 1989, her body was discovered in a rural area near Lake Elsinore. Among the clothes on her body were socks and a shirt that did not appear to be hers. The cause of death was asphyxiation due to strangulation. In her neck area were numerous scratches that appeared to have been caused by fingernails, both of the person compressing her neck and by the victim trying to free herself. There was bruising on the skin and in the muscles of her neck, and a hemorrhage and fracture of the hyoid bone. In addition, hemorrhaging in her scalp was indicative of blunt force trauma, and round red abrasions on her arms and other parts of her body were indicative of cigarette burns.

4

Two kinds of tests were performed on DNA found in a vaginal swab from Lyttle's body: restriction fragment length polymorphism (RFLP) and polymerase chain reaction (PCR). No results were generated by the RFLP test. PCR testing on the male fraction of DNA established one type that matched defendant. The probability of finding that type would be one in nine in the Black population, one in 11 in the White population, and one in five in the Hispanic population.[2] The small amount of DNA available prevented further testing.

On a towel draped over Lyttle's body were hairs that were similar to defendant's head hair, and pubic hair similar to defendant's pubic hair. Also on the towel were fibers similar to the carpeting, the sidepanel upholstery, and the seat fabric in defendant's van. Other fibers on the towel were similar to the blue nylon exterior, the red acetate lining and the white nylon insulation of a sleeping bag found in defendant's van. Sisal rope fibers found on the towel were similar to the sisal rope found in defendant's van.

### c. Murder of Tina Leal

On December 13, 1989, Tina Leal's body was discovered in the Lake Elsinore area on a dirt road that was not well traveled. A T-shirt that did not belong to her was on her body. The cause of death was asphyxiation due to ligature strangulation and stab wounds to her heart. She had hemorrhaging within her neck and eyes, and abrasions on her neck from a ligature. She had four stab wounds to her chest inflicted antemortem, two of which penetrated three to four inches and into her heart. She also suffered numerous other antemortem injuries, including injuries to her lip and chin consistent with being hit, a black eye, an

---

[2] It does not appear that any testimony was presented concerning defendant's ethnicity, but he appears in photographs in the record to be White.

5

incised or "cutting" wound to her left breast, lacerations or "splitting injuries" to her vagina, probably caused by blunt force, and a stab wound to the pubic area. Around her wrists and ankles was redness indicative of a binding ligature. A General Electric Miser 95-watt light bulb was found inside her uterus; the bulb apparently entered through the vagina and cervix. General Electric Miser 95-watt light bulbs were found in defendant's apartment.

Hairs found on one of her socks and on the body bag in which she was transported from the crime scene were similar to defendant's head hair. Fibers found on the T-shirt were similar to carpet fibers in the two units of an apartment building in which defendant lived from March 1987 until mid-1988 and beginning again in March 1989. Fibers on the T-shirt were similar to the red acetate lining of the sleeping bag and the gold acrylic fabric that covered a pillow found in defendant's van. Fibers found in her hair and on her clothing matched a sisal rope in defendant's van.

In April 1990, defendant gave one of his female friends a pair of red-and-white cloth tennis shoes. A fiber found on Leal's sock was similar to the fibers of the tennis shoes, and purple-brown acrylic fibers found on the T-shirt on Leal's body were similar to fibers found on the tennis shoes. In addition, a hair found in the shoes was similar to Leal's hair.

There were tire tracks on the shoulder of the road near Leal's body. Two tire tracks were consistent with a Yokohama 382 tire, and one tire track was consistent with an Armstrong Ultra Trac tire, which were the types of tires defendant had on his van at the time of this homicide.

### d. Murder of Darla Ferguson

Darla Ferguson's nude body was discovered on January 18, 1990, near a dirt road in the Lake Elsinore area. Her body was posed, with her legs up and her

6

arms positioned crossing her upper torso. The cause of death was asphyxiation due to strangulation. She had hemorrhaging in an eye and in the skin of her lips; abrasions on her neck; bruising in the skin and muscles of her neck; hemorrhaging in the thyroid cartilage of the neck; scratches on her neck consistent with fingernail marks; and bruising under her jawbones, possibly due to strangulation and possibly from blunt force injury. Her tongue was protruding and bitten between her teeth, which was indicative of asphyxia. In addition, she had hemorrhaging under her scalp, which was consistent with a blunt force trauma, and she had ligature marks on her wrists.

Male DNA found in the vaginal swab from Ferguson's body was analyzed by RFLP and PCR testing. Both analyses reflected that the DNA was consistent with defendant's DNA. The combined frequency with which the results of these two analyses would appear is one in 34,000 among Blacks, one in 154,000 among Whites, and one in 8,500 among Hispanics.

A hair found on Ferguson's arm was similar to defendant's head hair. Fibers found on her body were similar to the red acetate lining, the white nylon insulation, and the white acrylic insulation of the sleeping bag in defendant's van. A rope removed from her body and individual sisal rope fibers found on her body were similar to a rope found in defendant's van. A paint chip found on her chin was similar to paint chips found on a later victim, Carol Miller. On the edge of the roadway in front of the area where her body was found were tire tracks from a single vehicle that were consistent with an Armstrong Ultra Trac and a Yokohama 382, the types of tires defendant had on his van at the time of this murder.

e. *Murder of Carol Miller*

Carol Miller was last seen on February 6, 1990, on University Avenue in the City of Riverside (Riverside), entering a small blue automobile with a White

7

male. On February 8, 1990, her nude body was discovered in a grapefruit grove in the Highgrove area of Riverside County. The cause of death was five antemortem stab wounds to the chest, three of which penetrated her heart. She also exhibited signs of asphyxia, including hemorrhaging in her eyes, eyelids, lips and gums. The tissue that attaches the upper lip to the gum was torn, a condition that was consistent with being struck in the face and also with struggling while being smothered. There were ligature marks around her wrists.

Male DNA found in the vaginal swab from Miller's body was analyzed by RFLP and PCR testing, and both analyses reflected that the DNA was consistent with defendant's DNA. The combined frequency with which the results of these two analyses would appear is one in 234,000 among Blacks, one in 1,000,000 among Whites, and one in 55,000 among Hispanics.

A shirt partially covered her face. A hair found on the shirt was similar to defendant's head hair, and a hair found in her pubic area was similar to defendant's pubic hair. Fibers found on the shirt were similar to the red acetate lining, the white nylon insulation, and the blue nylon exterior of the sleeping bag in defendant's van, and to the van's carpet and dark fabric on the van's seats. Fibers found on the shirt and in her pubic area were similar to fibers in the rope found in defendant's van. Paint chips on the shirt were similar to a paint chip found on Darla Ferguson.

Tire track impressions consistent with Armstrong Ultra Trac tires and Yokohama 382 tires were found near the body. Track widths — the distance between two front tires or two back tires — of some of the tire impressions were consistent with Armstrong Ultra Trac tires being on the front and Yokohama 382 tires being on the back of defendant's van, which was the location of the tires when he purchased the Armstrong Ultra Trac tires.

8

### f. Murder of Cheryl Coker

Cheryl Coker was last seen by her husband on October 30, 1990, as she walked to University Avenue in Riverside to engage in prostitution. On November 6, 1990, her nude body was found in a dumpster located in an industrial area of Riverside. The cause of death was ligature strangulation. On her neck was a single thin ligature mark that was so deep in the front that it cut through the skin. Fingernail marks on her neck were consistent with someone trying to grab the ligature. Due to decomposition, the medical examiner could not identify petechial hemorrhage, but the reddish-brown color of the eyes probably indicated hemorrhaging. There was hemorrhage in the soft tissue under the ligature mark, and there were bruises on her forearms and on the backs of her legs. Her right breast had been excised postmortem, and was found approximately 30 feet away from the dumpster.

RFLP testing on DNA on a used condom found near her feet reflected five matches to defendant. The frequency of this combination of matches was one in 540 million Blacks, one in one billion Whites, and one in 150 million Hispanics.

Fibers from her pubic area were similar to the carpet in defendant's van and to the rope found in his van. A hair from her pubic area was similar to defendant's head hair.

Shoe impressions found in the vicinity of the dumpster could have been made by a pair of ProWings tennis shoes owned by defendant.

### g. Murder of Susan Sternfeld

Susan Sternfeld was last seen on December 19, 1990, at approximately 2:00 p.m., looking to "turn a trick" on University Avenue in Riverside. On December 21, 1990, her nude body was found in an enclosure for a dumpster in an industrial area in Riverside. The cause of death was strangulation. There were hemorrhages

in her eyes and eyelids and in the muscles of her neck, abrasions on her neck, and a fracture in her larynx.

RFLP testing on DNA from a vaginal swab reflected five matches to defendant. The matches were the same as found in the sample from the condom at the Coker crime scene. As noted above, that DNA profile appears in one in 540 million Blacks, one in a billion Whites, and one in 150 million Hispanics.

Fibers found on the victim's body were similar to defendant's van's carpet, upholstery, and seat fabric, the rope found in the van, and the red acetate lining of the sleeping bag found in the van.

### h. Murder of Kathleen Milne, also known as Kathleen Puckett

Kathleen Milne worked on University Avenue in Riverside. Her sister last saw her on January 18, 1991. Her nude body was found the next day adjacent to a dirt road in the Lake Elsinore area. The cause of death was asphyxiation due to strangulation and obstruction of her airway by a white sock that had been stuffed into her mouth. She had hemorrhages in her eyes, mouth, and neck, and a fracture in her larynx.

RFLP testing on DNA from a vaginal swab reflected four matches to defendant. The frequency of this combination of matches was one in 16 million Blacks, one in 23 million Whites, and one in 13 million Hispanics.

A fiber from her hair was similar to the carpet in defendant's van. A tuft of yarn recovered from the sock in her mouth was similar to fabric on the seats of defendant's van. One of the tire impressions found off the roadway and in the direction of her body was consistent with an Armstrong Ultra Trac tire, the type of tire that was on defendant's van, and was also consistent with tire impressions at the Leal, Ferguson, and Miller crime scenes.

10

### i. Murder of Sherry Latham

Sherry Latham worked on Main Street in Lake Elsinore. Her nude body was found on July 4, 1991, in a field in the Lake Elsinore area. The cause of death was strangulation. There was hemorrhaging in the muscles of her neck and a fracture in her thyroid cartilage, but decomposition made it difficult to identify other injuries.

A hair found on Latham was similar to hair from defendant's cat. Fibers found on her were similar to the red acetate lining inside the sleeping bag in defendant's van and fibers from a rope in defendant's van.

### j. Murder of Kelly Hammond

Kelly Hammond was last seen on August 15, 1991, working on University Avenue in Riverside. On the evening she disappeared, her friend, Kelly Whitecloud, was also working as a prostitute on University Avenue. Whitecloud entered a van that pulled up beside her, and the man inside agreed to pay her $20 for sexual services. Because Whitecloud was hungry, the driver first took her to a McDonald's restaurant, and then they returned to his van. In the van, they argued because he wanted to take her to "the orchards" and she wanted to go to her motel room. In addition, he said he would pay her only $10 because he had purchased food for her. She told him she wanted to get out, but he refused to stop the van, so she jumped out while it was moving. The van drove half a block farther and picked up Kelly Hammond. Whitecloud yelled to Hammond not to go, but Hammond left in the van and never returned.

Hammond's nude body was found on August 16, 1991, in an alleyway in an industrial area of the City of Corona. Her body had been posed, with her face down, her right arm under her abdomen, her left arm bent at the elbow with the palm of her hand facing upward, her left leg drawn up into her chest area, and her right leg extended outward. The cause of death was strangulation, with acute

11

opiate intoxication also contributing.  She had hemorrhages in her eyes and mouth, lacerations on her forehead, and abrasions on her face.  Abrasions on her wrist were consistent with a restraint.  A linear injury on the back of her neck and an abrasion on the front of her neck could have been inflicted with a ligature.  There were four areas of hemorrhage that were caused by compression on her neck.

RFLP testing on DNA from a vaginal swab reflected two matches to defendant.  PCR testing on the DNA also reflected one match to defendant.  The frequency of the combination of the two matches from the RFLP testing and the match from the PCR testing was one in 7,000 among Blacks, one in 18,000 among Whites, and one in 4,000 among Hispanics.

A hair from Hammond's body was similar to hair from defendant's cat. Fibers found on her body and in her hair were similar to fabric on the seats, fabric in the upholstery, and the carpeting of defendant's van.  A fiber from her body was similar to the red acetate lining inside the sleeping bag in defendant's van.

At trial, the manager of the McDonald's restaurant identified defendant as the man with Whitecloud the evening Hammond disappeared, and Whitecloud identified defendant as the driver of the van that picked up Whitecloud and then Hammond.  Whitecloud described the van as "bluish gray" with "grayish" carpeting.  She recalled that it had two "captain's chairs" in front and one in back, and something that looked like a Bible on the center console.  When shown a variety of vans by a police investigator the day after Hammond disappeared, she identified an Astro model van as the most similar to the van she had seen.  When defendant was arrested in January 1992, he was driving a Mitsubishi van.  The manufacturer's description of the van's color was "Ascot Silver," and defendant's ex-wife, Bonnie Ashley, described it as gray.  In the van's glove box was a "Notice to Appear" that had been issued to Kelly Marie Hammond a week before

she was last seen alive.  A black appointment book was found in the van, and two captain's chairs were found in defendant's apartment.

### k.  Murder of Catherine McDonald

Catherine McDonald worked on University Avenue in Riverside.  Her daughter saw her for the last time on September 12, 1991, when she left their apartment that evening, supposedly to go to the store.  On September 13, her nude body was found near a dirt road in a remote location in the Lake Elsinore area.  Her body was posed, with her legs spread apart, her feet together, and her arms extended outward from her body.  The cause of death was neck compression and multiple sharp force injuries.  There was hemorrhaging in her eyes, abrasions on her neck, and a large cut wound on her neck that penetrated through the muscle, the trachea, the left jugular vein, and the left carotid artery.  There were three stab wounds to her chest, two of which penetrated her heart.  The stab wounds to the chest and the wound to the neck were inflicted antemortem.  There was bleeding in the neck, separate from the bleeding associated with the neck wound, which was evidence of compression to her neck.  Her right breast had been excised postmortem.  There was a stab wound and four cut wounds to her genitalia; the stab wound and two of the cut wounds were inflicted antemortem.

RFLP testing on DNA from a vaginal swab reflected one match to defendant.  That match would be found in one in 115 Blacks, one in 250 Whites, and one in 119 Hispanics.

Fibers from McDonald's hair and body were similar to the red acetate lining of the sleeping bag, the white nylon insulation of the sleeping bag, the acrylic fabric of the gold pillow found in defendant's van, and fabric on the seats in defendant's van.  Hairs found in her pubic area and in her vagina were similar to defendant's pubic hair.  Hairs found in McDonald's head hair were similar to

13

the hair on defendant's cat. A hair found in the back of defendant's van was similar to McDonald's hair.

Tire impressions were found on the dirt road, and shoe impressions were found in the immediate vicinity of her body. The shoe impressions could have been made by a pair of Pro Wings tennis shoes owned by defendant. The tire impressions were consistent with a Yokohama 382 tire on the right rear wheel and Yokohama 371 tires on the front wheels. When defendant's van was impounded in January 1992, a comparison of its front left tire, a Yokohama 371, was made with a tire track left at the McDonald crime scene, and the features and wear pattern were similar. The model of tire on the left rear wheel of the vehicle associated with the impression at the crime scene was not identified before defendant's van was impounded, but it was subsequently determined that the left rear tire of his van, a Dunlop SP32J, could have made that impression at the McDonald crime scene. The track width and the wheel base of the tire impressions were consistent with a Mitsubishi van.

Defendant was employed by Riverside County as a stock clerk at the county's supply warehouse. He usually worked and took breaks at the packing table at the end of aisle 6. A box on a shelf at that packing table contained three purses, one of which contained an identification card with the photograph of a Black woman and the name McDonald on it.

*l. Murder of Delliah Zamora, also known as Delliah Wallace*

Delliah Zamora worked on University Avenue in Riverside. Her body was found on October 30, 1991, near a freeway interchange in Riverside County. The cause of death was strangulation. There were hemorrhages in her eyes, eyelids, and neck, and abrasions on her neck, perhaps caused by fingernails. Her larynx

14

was crushed, an injury that requires "an extreme amount of pressure." PCR testing of DNA from a vaginal swab reflected a match to defendant.

Fibers on her clothing were similar to the red acetate fibers in the lining of the sleeping bag, a fiber from her wrist was similar to the sisal rope, and fibers from her shirt and hair were similar to the gold pillow found in defendant's van.

In early November 1991, defendant gave his wife, Cheryl Suff, a blue denim "Levi" purse, telling her that his boss had found it. Cheryl did not want the purse. Also in November 1991, he gave a blue denim "Levi" purse to his neighbor, Vivian Swanson, telling her it had been Cheryl's, but Cheryl no longer wanted it. Sometime later in November, defendant gave Swanson a gold bracelet he claimed he had purchased. The "Levi" purse recovered from Swanson had belonged to Zamora. The gold bracelet belonged to Zamora's niece, who had left it at Zamora's house. Two rings found in defendant's wife's jewelry box had belonged to Zamora.

In the supply warehouse where defendant worked, a small purse containing citations issued to Zamora for prostitution and drug offenses was found in a box hidden on a shelf under the packing table at the end of aisle 6, where defendant typically worked. Another box on a shelf of the packing table at the end of aisle 6 contained three purses, one of which had belonged to Zamora and which contained earrings that were hers. Zamora had a habit of carrying smaller purses inside a larger purse. A blouse belonging to Zamora was found on a shelf of the packing table at the end of aisle 7.

### m. Murder of Eleanor Casares

Eleanor Casares worked on University Avenue in Riverside. Her sister last heard from her in the morning on December 23, 1991. At approximately 1:00 p.m., her nude body was found near a dirt road in orange groves. The cause of

15

death was strangulation.  There were abrasions on her neck, hemorrhages in her eyes and eyelids, a fracture in her thyroid cartilage, and a fracture and bleeding in her hyoid bone.  There was a stab wound in the middle of her chest, which also would have been fatal.  One of her breasts had been excised postmortem, and was found approximately 40 feet from her body.

Human blood on a knife found in defendant's van was type A.  A pinkish-white substance, which may have been fatty tissue, on the knife was tested to determine the type of its phosphoglucomutase (PGM) enzyme, and it was determined to be a PGM type 2+1-.  The blood and PGM types matched Casares's, and did not match defendant's.  This combination of blood type and PGM type appears in 1.2 percent of the Black population, 1.8 percent of the White population, and 1.9 percent of the Hispanic population.  Additional DNA testing reflected that the blood was consistent with Casares's and not with defendant's.

A hair from Casares's clothing was similar to defendant's head hair.  Hairs taken from her clothing and body were similar to defendant's pubic hair.  Hairs found on her body were similar to hairs from defendant's cat.  Hairs in defendant's van were similar to Casares's hair.  Fibers on her clothing were similar to the fibers of numerous items in defendant's van:  the carpeting, a green blanket, the gold pillow, the red acetate lining and white nylon insulation of the sleeping bag, and the sisal rope.

Shoe impressions where Casares's body was found could have been made by the Converse shoes defendant was wearing when he was arrested on January 9, 1992.  Tire impressions at the location were consistent with the Yokohama 371

16

tire, the two Uniroyal Tiger Paw XTM tires, and the Dunlop SP32J tire on defendant's van at the time he was arrested.[3]

Defendant gave the jeans that Casares was wearing on December 22, the day before her body was found, to a cousin of one of his neighbors. He gave the sweater she was wearing on December 22 to the agent who rented out apartments in defendant's apartment complex. An identification card with a photograph of a Mexican woman and with the name Casares on it was found in a purse in a box on a shelf of the table where defendant usually worked.

On December 23, 1991, defendant had scratches on his face that were "thick" and "looked like claw-like marks." During his interrogation on January 10, 1992, defendant admitted that on December 23, his van was on the avenue next to the orange groves, he had left his shoe impressions in the orange groves, and there was a body in the groves, but he denied putting the body there.

---

[3] This final crime scene was the sixth at which tire impressions were found that matched the types of tires defendant had previously purchased for his van. In addition, the tire impressions at the various crime scenes matched each other. More particularly, the Armstrong Ultra Trac impressions found at the Leal, Ferguson, Miller, and Puckett crime scenes were consistent with each other, and the Yokohama 382 impressions found at the Leal, Ferguson, Miller, and McDonald crime scenes were consistent with each other. Also, the impression of a Yokohama 382 tire at the McDonald crime scene, which was made more than 19 months after the earlier impressions, reflected a well-worn tire. Finally, tire impressions at the McDonald and Casares crimes scenes matched the tires that were on defendant's van when he was arrested. More particularly, a Yokohama 371 tire impression at the McDonald crime scene was consistent with the Yokohama 371 on defendant's van, including excessive wear on the outside of the tire; the Dunlop SP32J tire impression at the McDonald crime scene was consistent with the Dunlop tire on defendant's van; and the Yokohama 371, the Dunlop SP32J, and the two Uniroyal Tiger Paw XTM tire impressions at the Casares crime scene were all consistent with the tires on defendant's van at the time of his arrest.

### n. *Defendant's animosity toward prostitutes*

In 1984, defendant told his brother, Robert Suff, that he hated prostitutes. In August 1989, the 14-year-old daughter of the property manager at defendant's apartment complex and some of her friends dressed up like "Barbies," and asked defendant to judge who was the prettiest. Defendant said that the girls who were wearing makeup looked like "goddamn prostitutes." On another occasion, defendant became agitated about four women living with a man in the apartment complex, and said the women were "whores." In 1990, when a friend of defendant's stayed at his apartment for four to six weeks, defendant talked to her about prostitutes almost every night, and he commented that they needed to be killed because they were sluts. Defendant raised the subject of the ongoing prostitute killings five or six times with James Dees, a correctional officer, who came to the Riverside County supply warehouse to pick up supplies. In December 1991, defendant told Dees that he thought the person who was killing prostitutes was "going to clean the place up."

### 2. *Defense case*

Defendant impeached prosecution witnesses and presented evidence to rebut various aspects of the prosecution's case. He also presented two experts who challenged the probative value of the DNA evidence.

Defendant impeached various witnesses with prior convictions and inconsistencies or omissions in their statements or in their recollections. For example, in 1989, Jetmore told a detective that her assailant's belt buckle was silver, and in 1992, she told a detective it was gold colored; in 1991, the manager of the McDonald's said he could not remember the man who was with Whitecloud the evening Hammond disappeared, but he identified defendant at trial; in 1992, Whitecloud said she "tumbled out" of the van and landed on her feet, not that she

18

fell on her stomach; and defendant's brother, Robert Suff, who testified for the prosecution, had been convicted of a misdemeanor and three felonies.

Defendant presented evidence related to a wide variety of other points. For example, his evidence reflected that on December 19, 1990, defendant's timecard reflected that he worked from 7:00 a.m. to 4:30 p.m., hours that would have made it difficult for him to have encountered Sternfeld, who was last seen around 2:00 p.m. that day; on July 2, 1990, the last time Latham's boyfriend saw her, she was entering a black Nissan Maxima; on August 15, 1991, the day Hammond disappeared, she was seen being picked up around midnight by a man in a blue pickup truck; on December 23, 1991, the day Casares's body was found, a waitress saw her get into a light blue truck with two young men at about 9:00 a.m. on University Avenue in Riverside; on December 23, 1991, defendant was home when Cheryl Suff woke up at 9:00 a.m. or 10:00 a.m., and she recalled telling a detective that she thought she had defendant's van that day, but that she was not certain she had it; defendant was nice to prostitutes, although he did not like prostitutes who "were chasing drugs 24 hours a day"; and defendant's brother, who testified that defendant had told him at Bonnie Ashley's house that he hated prostitutes, may not have ever been at Ashley's house.

With respect to the physical evidence, defendant elicited testimony from a prosecution expert that sisal fibers in general are very similar, and that if another sisal rope were purchased, the expert probably would not be able to distinguish its sisal fibers from the fibers at issue. In addition, testing to determine the PGM type of semen found on vaginal swabs from the bodies of Ferguson, Puckett, Hammond, and McDonald revealed PGM types that were consistent with these victims' respective PGM types, and not consistent with defendant's PGM type, but based on the low to moderate levels of sperm that were present in the swabs, it

19

was more likely that the PGM types discerned were from the victims' vaginal secretions than from the sperm.

Defendant presented two witnesses who challenged the validity of the prosecution's DNA statistics. Laurence Mueller, an expert in population genetics and evolutionary biology, criticized the way in which the Federal Bureau of Investigation (FBI) calculates the frequency of particular lengths of DNA generated through RFLP testing. He stated that because frequencies vary among subgroups of broader racial groups, calculating the frequency of a particular combination of results based on the frequencies within a broad racial group will result in an inaccurate answer. Using data from the Mayan population in Mexico and the Surui population in Brazil, Mueller testified that a particular six-locus match appears in one in 37 people in these populations, but the FBI's techniques would generate a frequency of one in 96 million. He also testified that the FBI's criteria for determining whether there is a match underestimates, in some cases, the chance of finding a match.

Mueller stated that the National Research Council (NRC) has recommended that the criteria be adjusted, but the FBI has not followed that recommendation. He calculated the match probabilities following the NRC's recommendations, and determined the following frequencies with which the DNA matches in this case would appear: Ferguson, one in 40; Miller, one in 111; Coker, one in 11,000; Sternfeld, one in 6,972; Puckett, one in 6,086; Hammond, one in 50; and McDonald, one in 23.

John Gerdes, the clinical director of a company that matches organ donors and recipients for transplants, described ways in which a sample may be contaminated by the presence of more than one type of DNA. First, the sample may begin with more than one source of DNA. Second, in the forensic setting, DNA may be inadvertently transferred from one sample to another as the evidence

20

is manipulated. Third, when DNA is amplified to millions or billions of copies in a laboratory, it becomes easy to contaminate the lab itself with DNA. He testified that in a clinical laboratory, personnel aseptically collect a sample from a known individual, but in his experience, forensic personnel are not trained as well in aseptic technique. Also, a crime scene is not a sterile environment. In Gerdes's view, contamination problems present an equal chance of false inclusion and false exclusion, and until there are adequate controls to prevent such errors or to identify how often they occur, PCR analysis should not be used in legal proceedings. He noted that the NRC report states that in the context of mixed donors, the analysis cannot identify a major donor and a minor donor.

### 3. Rebuttal

Bruce Budowle, a research scientist with the FBI, confirmed that there are population substructures reflecting differences between subgroups. Studies have been done comparing estimates of frequencies among all of the different databases from around the world, and the data relating to different subgroups does not produce substantially different estimates as long as the subgroups are within the same major category. There may be special circumstances in which the subgroup is an issue, such as an isolated native population in Brazil that does not travel elsewhere, but if that group is not located where the crime was committed, it is irrelevant. In Budowle's view, the report prepared by the NRC reflected poor science. The report was not peer reviewed before it was published, and criticisms began after its publication. With respect to Dr. Mueller's calculations, Budowle stated that there is a one in 1,000 chance that two brothers will have five matches, yet Dr. Mueller calculated the frequency of the five matches to defendant found in the Coker and Sternfeld cases as one in 354. He stated that Mueller's calculation "defies genetics and science." He also stated that population genetics among fruit

flies, which is what Mueller studied, was different from population genetics among humans, who historically have traveled more than fruit flies. In his view, multiplying together the frequency estimation from the RFLP methodology and from DQa results was reasonable. He described the FBI's procedures as reliable and valid.

## B. Penalty Phase Evidence

### 1. Prosecution case

The prosecution presented details concerning defendant's 1973 murder of his baby daughter, evidence that he killed another prostitute in a different county in 1988, evidence related to physical abuse of defendant's second baby daughter in 1991, and victim impact evidence.

With respect to the victims, evidence was presented that Catherine McDonald was four months pregnant. In addition, 16 relatives of 10 of the murder victims testified concerning the impact of the murders on them. (See *post*, II.C.1.)

Evidence concerning the 1973 death of defendant's two-month-old daughter, Dijanet Suff, in Texas, for which defendant was convicted of murder, reflected that the cause of death was blunt force trauma. Bruises covered most of the front of the infant's body, and one injury was a human bite mark. There was significant blunt force trauma to the head or severe shaking of the infant. A large quantity of blood in the abdominal cavity indicated a massive injury within the abdomen. Two ruptures of the liver would have required a great amount of force. Multiple fractures to the ribs and a fracture of an arm bone were several weeks old. An abrasion on one foot was consistent with a burn mark.

Evidence was presented that in January 1988, defendant killed Lisa Lacik, who used drugs and worked as a prostitute in San Bernardino County. Lacik was stabbed to death, and also suffered blunt force trauma to her forehead. In addition,

22

her right breast had been excised. In 1992, Connie Anderson, who saw Lacik get into a vehicle with a man who had offered her $100, identified defendant in a photographic lineup as the person who had picked up Lacik.

Evidence was also presented of physical abuse of defendant's daughter, Bridgette Suff, who was born in July 1991. Defendant's wife, Cheryl, returned home one evening in October 1991, when defendant had been caring for Bridgette, and found that the child did not respond as she normally did, and did not open her eyes. A nurse at a hospital advised Cheryl to bring the baby in, but defendant refused, and Cheryl did not have a driver's license. The baby was admitted to the hospital the next day. A review by a suspected child abuse and neglect (SCAN) team determined that an ankle fracture was likely caused by nonaccidental trauma; four of her ribs had been fractured two to three weeks earlier, and the fractures were of a type consistent with someone grabbing Bridgette and shaking her; and there was widespread swelling of her brain, which would be caused by a whiplash type of injury, and was consistent with someone grabbing a baby and shaking the baby violently. The injuries almost caused Bridgette to die. A houseguest saw defendant, perhaps the weekend before Bridgette was hospitalized, pick Bridgette up and shake her while yelling at her to shut up.

### 2. *Defense case*

Defendant presented evidence to raise doubt concerning his commission of the Lacik killing and the abuse of Bridgette Suff. In addition, his mother testified concerning his life, several witnesses testified about his childhood, and employers and friends testified about his good qualities. The jury also heard about his conduct while in county jail. Finally, an expert testified about prison life for those who are sentenced to life without the possibility of parole, and concerning defendant's adjustment to life in prison.

23

With respect to the Lacik killing, a detective testified that Connie Anderson stated that "she didn't get a really great look" at the man who picked up Lacik. With respect to the abuse of Bridgette Suff, a police sergeant testified that defendant's houseguest told him that Bridgette would crawl around and bump up against things.

Defendant's mother testified that when defendant was 16 years old, his father abruptly left the family without telling anyone he was leaving, and after he left, he never wrote to them. Defendant helped with his four younger siblings and also worked part time to help the family. After high school, he joined the Air Force and moved to Texas. His girlfriend, Teryl, became pregnant while he was away, but they married, and they gave the baby to defendant's mother to raise. Thereafter, Teryl gave birth to a son and a daughter. When defendant returned to California after serving 10 years in prison for murdering his daughter, he was more withdrawn. Several other witnesses also testified concerning his childhood, recalling that defendant's mother had little interest in her children, that defendant took over the father role when his father left, and that defendant was a normal, quiet high school student who did not appear to have any problems with girls.

Employers recalled defendant's excellent computer skills, and described him as enthusiastic, friendly, likeable, and punctual. One couple who employed him trusted him to pick up their child from school, and testified that defendant was afraid of doing anything wrong and going back to jail. Defendant's supervisor at the county warehouse recalled that he volunteered for social events and was very mindful of his daughter Bridgette. Several people testified that defendant helped them with work and personal chores.

During defendant's time in county jail, he had one "disciplinary marker," for possession of contraband — a safety pin, a paper clip, and a staple. A nurse at

24

the jail testified that he was always pleasant and polite, and that he spent his time watching public television, reading, and writing a cookbook.

James Park, a prison expert, reviewed the grand jury transcripts and defendant's Texas prison records, and interviewed defendant. He found defendant to be an intelligent person who was realistic about his situation. Defendant did well in the Texas prison system, with only two disciplinary incidents noted during his 10 years, neither of which involved violence. He worked in prison, and also obtained his associate and bachelor degrees. Park predicted that defendant "would be an excellent, conforming prisoner, nonviolent, will work as assigned, do what he's told," and Park did not expect any problems with defendant. If sentenced to life without the possibility of parole, defendant would be placed in a level 4 maximum security prison. In Park's opinion, defendant would make an excellent adjustment to prison. As a level 4 prisoner, his cell would be 60 or 80 square feet, and he would be allowed to have a television, stereo system, and typewriter if he purchased them. He would be allowed to work and to participate in hobbies, and he could purchase personal items from the prison canteen. Defendant could earn a lower security rating; of 1,576 life prisoners without the possibility of parole, 300 to 400 of them were in level 3 prisons, and two or three were in level 2 prisons. Finally, Park testified that because defendant killed a baby and 12 women, he was likely to be victimized in prison, and might require protective custody.

## II. DISCUSSION

### A. Pretrial Issues

#### 1. *Removal of public defender's office as defendant's counsel*

Defendant contends that the trial court's removal of the Riverside County public defender's office as his counsel violated his right to counsel under the Sixth

Amendment to the United States Constitution and article 1, section 15 of the California Constitution.

In October 1992, less than nine months after defendant was arrested and more than two years before defendant's trial commenced, the district attorney moved to relieve the public defender as defendant's counsel, based upon a conflict of interest arising from the public defender's prior representation of victims and prosecution witnesses. The public defender had previously represented Rhonda Jetmore, the victim of the count alleging attempted murder, and she was unwilling to waive her attorney-client privilege. The public defender had also represented 18 potential witnesses in 56 matters, and 11 of these individuals executed declarations stating they were unwilling to waive their attorney-client privilege.

Prior to filing his opposition, defense counsel indicated that discovery would be necessary to enable the defense to evaluate these individuals' relationships to the public defender's office and to this case. The court responded that the content of the witnesses' testimony was not relevant, and it would be sufficient for the prosecutor to provide a list of potential witnesses, with their addresses and telephone numbers. The court also rejected defendant's contention that the prosecutor had no interest in who represented defendant and should not be allowed to participate in the proceedings to relieve counsel.

In his written opposition, defendant asserted that the public defender's prior representation of individuals who would be witnesses in the present matter did not automatically give rise to a conflict of interest, absent a threatened disclosure of confidential information. In addition, defendant's deputy public defender executed a declaration stating that he had represented defendant for more than 10 months, their working relationship was "close and harmonious," defendant wished counsel to continue representing him, and the Riverside County public defender's office would not declare a conflict. The deputy public defender also informed the

26

court that he had not personally represented any of the individuals previously represented by the public defender, with one exception — he had made one appearance, not as the attorney of record, in connection with one individual's failure to appear in court, he did not have contact with that individual, and he recalled no information about the case. Finally, the deputy public defender was not aware of any confidential information relating to the prior representations, and the defense would not use any confidential information. In the event the court found a conflict, defendant urged the court to consider measures other than disqualification of the public defender's office, such as appointing another attorney to conduct cross-examination of former clients of the public defender's office.

The trial court relieved the public defender, and selected the county's conflicts panel to represent defendant. The court took judicial notice of the exhibits and the case files in prior criminal actions, and concluded that "38 current and former [deputy] public defenders represented all these individuals in various cases . . . . At least 25 of those are current [deputy] public defenders in the office." It also observed that the individual who was the acting public defender until two days prior to the hearing had made appearances in the prior actions, and that the wife of that acting public defender (1) had been counsel in one of the prior actions and (2) had been one of defendant's counsel until two days prior to the hearing. The court concluded that there had been "confidences, numerous and replete, by the public defender's office with these various potential witnesses." With respect to defendant's willingness to waive any conflicts, the court observed that Jetmore and other witnesses were unwilling to waive conflicts with respect to their prior representation by the public defender. The court stated that there was an actual conflict of interest, and "a potential conflict of interest that is so replete, so staggering, that I think I would be remiss in not granting the motion."

27

Defendant contends the trial court abused its discretion in finding a conflict of interest, because the court did not determine that relevant confidential information existed or that defense counsel was privy to any confidential information that could be used by the defense. He also contends that the trial court abused its discretion by rejecting less drastic remedies, such as appointing separate counsel for the limited purpose of cross-examining witnesses who previously had been represented by the public defender, and by refusing to accept his offer to waive any conflict. Finally, he asserts that the trial court abused its discretion in allowing the prosecutor to participate in the disqualification proceedings, and the prosecutor's actions constituted prosecutorial misconduct. As explained below, we find no abuse of discretion in the trial court's decision to disqualify the public defender's office and, in any event, any error was harmless.

A trial court has inherent authority to "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." (Code Civ. Proc., § 128, subd. (a)(5).) This power "authorizes a trial court . . . to discharge an attorney who has a conflict of interest." (*People v. Noriega* (2010) 48 Cal.4th 517, 524 (*Noriega*).) Generally, a trial court's decision to disqualify an attorney is subject to review for an abuse of discretion. (*In re Charlisse C*. (2008) 45 Cal.4th 145, 159 (*Charlisse C*.)

The trial court took judicial notice of the numerous cases in which the public defender's office had represented witnesses in this case, and it determined that relevant confidential information existed, stating that there were "confidences, numerous and replete" with respect to the former clients of the public defender's office, there was an actual conflict of interest, and there was "a potential conflict of interest that is so replete, so staggering, that I think I would be remiss in not granting the motion." Defendant does not contend that the court's determinations

28

are unsupported by substantial evidence. (See *People ex rel. Dept. of Corporations v. Speedee Oil Change Systems, Inc*. (1999) 20 Cal.4th 1135, 1143 ["the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence"].)

To the extent defendant focuses on the knowledge of the particular deputy public defender assigned to represent him, his challenge relates to the disqualification of the entire public defender's office. The trial court did not have the benefit of the analysis set forth in *Charlisse C., supra*, 45 Cal.4th 145, which requires the trial court to consider what screening measures or structural safeguards could protect the former clients' confidences, and places on the defendant the evidentiary burden to show that confidential information can be screened within the public defender's office. (*Id*. at pp. 161-166.) Nonetheless, the trial court inquired of defense counsel what measures could be taken short of recusal of the public defender's office. In response, defense counsel proposed allowing defendant to waive the conflict and appointing outside counsel to cross-examine witnesses who had previously been represented by the public defender's office. It also appears that the trial court considered whether defendant's counsel would become privy to the confidences held by others in the office. The court noted not only the large number of prior cases involving potential witnesses and the numerous deputy public defenders who had been involved in those cases, but also the fact that the individual who was the acting public defender until two days before the hearing had been involved in the defense of the prior criminal actions in which confidences were gained, and that the wife of the individual who had been the acting public defender had been one of defendant's counsel until two days earlier. (See *id*. at pp. 163-164 [where the attorney with a conflict has supervisorial or policymaking responsibilities, it is more difficult to isolate an attorney serving under them from information and influences].)

29

In light of the extraordinary number of witnesses and deputy public defenders relevant to the disqualification motion, the trial court's finding that the potential conflict of interest was "staggering," and the early stage in the proceedings at which disqualification was sought, we find no abuse of discretion in the trial court's action in disqualifying the entire office and not appointing separate counsel to cross-examine the numerous witnesses who had previously been represented by that office. For the same reasons, we conclude that the trial court did not abuse its discretion in rejecting defendant's offer to waive the conflict. (See *Wheat v. United States* (1988) 486 U.S. 153, 162-163 ["likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict"; trial courts "must be allowed substantial latitude in refusing waivers of conflicts of interest"]; *People v. Jones* (2004) 33 Cal.4th 234, 240-241.)

In any event, assuming the trial court's procedure did not adequately consider ways to screen defendant's counsel or other alternatives to disqualification, as we subsequently prescribed in *Charlisse C., supra*, 45 Cal.4th 145, or that the decision was otherwise flawed, defendant has not undertaken to establish that replacement of his counsel altered the outcome of the trial. Accordingly, "[h]e has not shown a reasonable probability (see *Noriega, supra*, 48 Cal.4th at p. 525) or possibility (see *People v. Brown* (1988) 46 Cal.3d 432, 447) that the jury would have reached a different verdict at either the guilt or the penalty phase of the trial had the public defender's office continued to represent him." (*People v. Thomas* (2012) 54 Cal.4th 904, 924.)

With respect to defendant's state constitutional right to counsel (Cal. Const., art. I, § 15), "a trial court does not violate a defendant's right to counsel under the state Constitution when it 'removes a defense attorney because of a potential conflict of interest.' " (*Noriega, supra*, 48 Cal.4th at p. 524.) As noted above, the trial court concluded that the potential conflict of interest was

30

"staggering." Therefore, the trial court's removal of the public defender as defendant's counsel in this matter did not violate defendant's state constitutional right to counsel.

With respect to defendant's rights under the federal Constitution, " '[t]he right to counsel of *choice* does not extend to defendants who require counsel to be *appointed* for them.' (*United States v. Gonzalez-Lopez* [(2006)] 548 U.S. [140,] 151, italics added.)" (*Noriega, supra*, 48 Cal.4th at p. 522.) The "replacement of one appointed attorney with another does not violate a defendant's constitutional right to effective assistance of counsel unless replacement counsel's representation ' "was deficient when measured against the standard of a reasonably competent attorney and . . . this deficient performance caused prejudice in the sense that it 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " ' " (*Id*. at p. 522.) Defendant does not attempt to show that his new counsel was deficient. Therefore, he has failed to establish a violation of his right under the Sixth Amendment to the effective assistance of counsel. (*Id.* at pp. 522-523; see *Thomas, supra*, 54 Cal.4th 908, 923-924.)

Independent of the merits of the disqualification, defendant claims that the trial court abused its discretion in allowing the prosecutor to participate in the proceedings to disqualify the public defender. In the trial court, defense counsel asserted that the prosecutor should not be a party to the process of determining whether defense counsel should be disqualified, questioned whether the prosecutor should be served with defendant's responding points and authorities, and requested that the defense be allowed to respond in camera. He also complains that by placing the burden on the prosecutor to establish that disqualification was appropriate, the trial court gave the prosecution the last word on the issue and did not allow defendant to respond further. Defendant attempts to analogize the

disqualification process to a *Marsden* proceeding (*People v. Marsden* (1970) 2 Cal.3d 118), stating that the only substantial difference is that in a *Marsden* proceeding, it is the defendant who seeks to remove his or her own counsel. But unlike a *Marsden* proceeding, in which privileged information may be revealed to establish the reasons the defendant seeks the removal of counsel, the motion to disqualify the public defender's office concerned that office's relationship to individuals *other than* defendant; the disqualification proceeding did not require the disclosure of any privileged information. The trial court did not abuse its discretion in allowing the prosecutor to participate in the proceedings.

Finally, defendant contends that the prosecutor was overly aggressive in pursuing the disqualification of the public defender's office, and that various actions the prosecutor took were inappropriate. He asserts, for example, that the prosecutor persuaded witnesses that the public defender's office would be required to breach a nonexistent privilege, that he gave legal advice to witnesses and asserted their attorney-client privilege, thereby creating a conflict between their interests and "his duties to see that justice was done," and that he claimed he intended to present various witnesses and subsequently stated that he was not sure if he would present them.

Defendant asserts that the prosecutor's actions "infected [defendant's] trial with such unfairness as to make the conviction a denial of due process in violation of both the federal and state Constitutions." (See *People v. Maciel* (2013) 57 Cal.4th 482, 541 [prosecutorial misconduct includes conduct that infects the trial with such unfairness as to violate the right to due process].) Although defense counsel expressed concern in the trial court that the prosecutor had contacted clients of the public defender's office and was seeking affidavits from those individuals without giving notice to the public defender, and raised the possibility that some of those individuals had waived their privileges by discussing matters

32

with the prosecutor, no objection of prosecutorial misconduct was made. Therefore, this claim has been forfeited. (*People v. Boyette* (2002) 29 Cal.4th 381, 432; *People v. Jones* (1991) 53 Cal.3d 1115, 1144.) In any event, although the prosecutor's actions may have contributed to the disqualification of the public defender, it does not appear they had any other effect on the subsequent proceedings. Thus, the prosecutor's actions did not infect the trial itself with unfairness.

### 2. Denial of defendant's motion for a change of venue

Defendant contends the trial court's denial of his motion for a change of venue violated his rights to due process and to a fair trial by an unbiased jury under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, and 16 of the California Constitution.

In December 1994, approximately two months before trial, defendant filed a motion for a change of venue. He asserted that "[t]hese alleged crimes have engendered community shock, fear and indignation," and "[t]he publicity has made the members of the community so aware of the alleged circumstances that an impartial jury cannot be obtained." He stated that potential jurors had been exposed to information in the media that would not be admissible, at least at the guilt phase of trial. According to a public opinion survey conducted between November 8 and November 22, 1994, during which 396 residents of Riverside County were interviewed, 73.2 percent of the sample recognized this case, and 66.9 percent of that 73.2 percent (49 percent of the sample) thought defendant was "definitely guilty" or "probably guilty." In addition, 47.6 percent of the sample was aware of defendant's prior conviction for murdering his child.

In January 1995, the court heard testimony from defendant's expert, Edward Bronson, a professor of political science, concerning the likelihood that

33

defendant could receive a fair trial in Riverside County. Based on the opinion survey of residents of the county, analysis of media coverage related to the case, and consideration of other factors, including the gravity of the crime and the status of defendant and the victims, he concluded there was a reasonable likelihood defendant could not receive a fair and impartial trial in Riverside County.

Bronson focused on newspaper articles, because he found that the television coverage "simply reflects what's found in the newspaper publicity, but in a far less comprehensive way."[4] He testified that there was "a flood of publicity," but also that "the major articles were [in] the earlier period, going back primarily to 1992, and then also to 1991." With respect to the "emotional" or "inflammatory" aspects of the coverage, he counted 265 references to "serial killer" in "the first half of the publicity." He also noted references to nude bodies, sexual mutilation, bite marks, semen found on all 19 bodies,[5] and the posing of some bodies in lewd positions, and stated that the reporting on bite marks was troubling because there was some reference to the presence of bite marks on the child killed by defendant in Texas. He also focused on terms and phrases such as "grisly," "gruesome," and "reign of terror" as evidence of the inflammatory character of the coverage. With respect to publicity concerning inadmissible facts, Bronson noted that the district attorney had declined to state whether defendant had confessed, and Bronson asserted that if there was no confession, the district

---

[4]    He reviewed articles from local newspapers such as the Press-Enterprise, as well as articles from the Los Angeles Times, the Orange County Register, the San Diego Union-Tribune, and USA Today.

[5]    The press reported that 19 women had been identified by Riverside County authorities as victims of a serial killer who preyed on prostitutes and drug abusers. The tally began with an October 1986 homicide, and the 19th victim was Eleanor Casares. Defendant was prosecuted for 13 of these homicides.

attorney's statements declining to state whether there was a confession were prejudicial. He also noted the coverage of defendant's prior murder conviction, which included graphic descriptions of the child's injuries. It had also been reported that defendant was "cold" and had "no remorse," that he and his former wife were "animals," and that jurors in the prior case believed he tortured his daughter to death. There was also reporting on the fact that in October 1991, defendant's three-month-old daughter had been beaten almost to death.

Bronson asserted that the news coverage "makes it remarkably clear that the evidence is overwhelming in this case." He noted statements by criminal justice officials that indicated defendant was guilty. He acknowledged that there was also exculpatory reporting, such as statements that defendant was not linked to some killings. He added, however, that the positive coverage defendant received, such as the fact that he participated in chili-cooking contests, was presented as evidence that he enjoyed attention. Similarly, the media linked defendant's work as an Air Force medic to serial killers' lack of abhorrence to blood.

Bronson also reviewed characterizations of defendant in the media, including references to his being a "murderer," a "convicted child killer," a "monster," and an "animal." Articles reported on his "very violent temper," and used terms such as "volcanic" and "explosive." He was called "a new Antichrist," and his ex-wife was quoted as saying, "he should rot in hell." His father was quoted as saying it was "a big mistake to release him from prison," and that neither parent planned to visit him. Bronson stated that although the victims were "on the margins of society," the media reflected a "redemptive process" through its reporting on their families and their struggles.

The court disagreed with Bronson's conclusion concerning the likelihood defendant could receive a fair trial in Riverside County, but acknowledged the

35

extensive publicity the case had received, and therefore decided not to make a final ruling on defendant's motion until a jury was impaneled. The court also stated that it would examine the questions that would be asked on the juror questionnaire regarding publicity, and would increase the amount of time counsel would be allowed to question prospective jurors.

In March 1995, after both sides declined to exercise further peremptory challenges and accepted the panel, defendant requested that the court revisit his motion for a change of venue. According to defense counsel's review of the juror questionnaire responses, approximately one-third of the prospective jurors responded that they knew nothing or recalled nothing of the case. Because approximately two-thirds of prospective jurors recalled, in varying degrees, the events underlying the charges, defense counsel concluded defendant could not receive a fair trial in Riverside County. Counsel explained that he exercised only 10 of his 20 peremptory challenges because the prosecutor had exercised only seven peremptory challenges, and "we decided at a certain point in time that the mix was as good as we were going to get."

The court noted that it had allowed unlimited confidential voir dire of any prospective juror who "expressed any knowledge about the case to any extent other than 'Yes,' and then the press or TV." It stated that, among the 12 jurors and eight alternates, six wrote on their questionnaires that they knew nothing of the case, and four had limited knowledge of the case.[6] The court concluded defendant

---

[6] The six jurors who indicated on their juror questionnaires that they knew nothing of the case before coming to court were Jurors Nos. 2, 4, 9, and 11 and Alternate Jurors Nos. 2 and 8. Juror No. 2, however, stated during voir dire that "[a]fter going through and answering these questions . . . , I started vaguely remembering the case as it had happened several years prior to that." She added that she did not remember much of what she read, "[j]ust vaguely that they kept finding these girls' bodies."

*(footnote continued on next page)*

The four jurors described by the court as having limited knowledge of the case were Jurors Nos. 3, 6 and 8, and Alternate Juror No. 7. Juror No. 3 wrote that she had "skimmed the initial article" in the Press-Enterprise. Juror No. 6 wrote that she read about the case in the Press-Enterprise, and that "I don't remember what I read in paper. I think it was several years ago." Juror No. 8 wrote that she did not remember whether she had seen or heard anything about the case. Alternate Juror No. 7 wrote that he "[p]robably read about it in local papers but didn't give it much attention. I lived in Ohio until 1992."

The other 10 jurors and alternates responded on the questionnaire as follows: Juror No. 1 wrote that he had read some articles in the Press-Enterprise regarding the murders, the case, and defendant's arrest, but he had no thought concerning the truth or falsity of the charges, explaining that "I was not able to read enough information." Juror No. 5 wrote that he read about the case in the newspaper, but "didn't pay that much [attention] to the articles." Juror No. 7 wrote that she heard about the case on television, and could disregard anything that she had heard. Juror No. 10 wrote that she had not seen or read "very much" about the case, and added that someone at her place of employment had "said a few things about what they had found in the van." She also wrote that she had "not followed this case enough to have thoughts either way" about the truth or falsity of the charges. Juror No. 12 wrote that he "heard [defendant] worked for County of Riverside on the news shortly after arrest," and that he had no thoughts about the truth or falsity of the charges. Alternate Juror No. 1 wrote that he heard about the case from "[o]n and off again reports in the 'Press-Enterprise' . . . . Most coverage when arrest first made." With respect to whether he had any thoughts about the truth or falsity of the charges, he wrote, "Have not read any proof of evidence findings in news accounts." Alternate Juror No. 3 wrote that she heard about the case from friends, family, and coworkers, that she did "not particularly" have any thoughts concerning the truth or falsity of the charges, and that her "friends/family are not always an accurate source" of information. Alternate Juror No. 4 wrote that she heard about the case in the newspaper and on television, and "[o]n the surface, my reaction is [defendant is] guilty." Alternate Juror No. 5 wrote that she heard defendant's name and of the accusations through her employment at the sheriff's department, and that she had not "given it any consideration in any way" whether the charges were true or false. Alternate Juror No. 6 wrote that he had read about the case in a newspaper, and did not have any thought concerning the truth or falsity of the charges.

37

could receive a fair trial in Riverside County and from the jury panel selected, and denied the motion for a change of venue.

"[T]he court shall order a change of venue: [¶] . . . when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county." (§ 1033, subd. (a).) "The phrase 'reasonable likelihood' in this context 'means something less than "more probable than not," ' and 'something more than merely "possible." ' " (*People v. Proctor* (1992) 4 Cal.4th 499, 523.) "On appeal from the denial of a change of venue, we accept the trial court's factual findings where supported by substantial evidence, but we review independently the court's ultimate determination whether it was reasonably likely the defendant could receive a fair trial in the county. . . . [A] defendant challenging the court's denial of a change of venue must show both error and prejudice, that is, that it was not reasonably likely the defendant could receive a fair trial at the time of the motion, and that it is reasonably likely he did not in fact receive a fair trial." (*People v. Rountree* (2013) 56 Cal.4th 823, 837.) "Both the trial court's initial venue determination and our independent evaluation are based on a consideration of five factors: '(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim.' " (*People v. Leonard* (2007) 40 Cal.4th 1370, 1394.)

With respect to the first factor, the 13 murder charges and the attendant special circumstance allegations weighed in favor of a change of venue, but the nature and gravity of the offenses is not dispositive. As we noted in *People v. Farley* (2009) 46 Cal.4th 1053 (*Farley*), "on numerous occasions we have upheld the denial of change of venue motions in cases involving multiple murders." (*Id.* at p. 1083; see, e.g., *People v. Ramirez* (2006) 39 Cal.4th 398, 407, 434-435 [13 counts of murder].)

Addressing the second factor, *post*, the last three factors did not weigh in favor of a change of venue. Given Riverside County's population, as of January 1, 1994, of 1,357,000, the size of the community was a neutral factor. (See *People v. Anderson* (1987) 43 Cal.3d 1104, 1131 [the size of the community was a neutral factor when Riverside County's population was 600,000]; see also *People v. Kelly* (1990) 51 Cal.3d 931, 955 ["The community, Riverside County, is large and diverse"].) Defendant's contention that the dispersal of this large population through much of the county, resulting in only two cities with populations greater than 100,000 and perhaps a sense of small-town life in many areas of the county, does not alter our conclusion. "When, as here, there is a 'large, diverse pool of potential jurors, the suggestion that 12 impartial individuals could not be empanelled is hard to sustain.' " (*People v. Famalaro* (2011) 52 Cal.4th 1, 23 (*Famalaro*); see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 45 [rejecting relevance of argument that state's fourth most populous county "is like a collection of small towns"].) With respect to defendant's status in the community, defendant conceded in his motion that he "has never been a prominent or highly-visible member of the community." With respect to the victims' prominence, they "were prostitutes. Although they could be seen as especially vulnerable, they [did] not occupy an elevated position in society." (*People v. Jennings* (1991) 53 Cal.3d 334, 363.)

Finally, we consider the second factor, the nature and extent of the media coverage. Newspaper articles submitted by defendant include two from 1988, three from 1989, and three from 1990, each reporting on the discovery of female human remains, with two articles referencing the possibility of a serial killer. Sixty-two articles published in various newspapers in 1991 increasingly referred to a serial killer, and began tallying the number of victims with each discovery of another body, which ended in December 1991 with a count of 19 victims. Articles

39

in 1991 also reported on the increase in law enforcement personnel assigned to the investigation, and referred to a killer "stalking local valley communities," "giv[ing] Lake Elsinore [a] bad image," and "bring[ing] urban realities to Lake Elsinore." On New Year's Day, 1992, it was reported that Riverside's 42 homicides in 1991 set a record high, almost double the number of homicides in 1990.

Defendant was arrested on January 9, 1992. Media coverage was extensive through mid-January, and then began to decline. On January 13 and 14, 1992, articles regarding defendant's detention on a parole violation referred to his being a suspect in 19 killings. Some of the articles referred to reports that defendant had been detained "during a 'transaction' with a prostitute" and had confessed to some of the killings. Some noted that defendant had been convicted in Texas of beating his two-month-old daughter to death, and had been paroled after serving 10 years of a 70-year sentence.

On January 15, it was reported that defendant had been charged with two killings, and was suspected in 19 murders. Articles included details of the beating death of his daughter, the Texas prosecutor's characterization of defendant as an "animal," and statements from defendant's lawyer in the Texas prosecution that the lawyer saw no remorse in defendant in that prior case. A juror in the Texas case described "horrifying" details that led the jury to believe defendant "tortured" his daughter to death, and characterized defendant as "cold" and lacking remorse. There was information linking defendant's van's tires to tire tracks at some of the crime scenes, and statements by law enforcement officials that the evidence was "strong," "primarily scientific," and might involve DNA testing. It was also reported that defendant appeared in court with his hands shackled, had failed to report annually to the Texas parole board, and was not monitored by Texas officials due to a "computer glitch." A neighbor of defendant's was quoted as

40

saying that defendant went out at "strange hours," and that when defendant answered his door on December 21, 1991, he was "all shaken up" and had scratches on both sides of his face. Prominent serial killers as well as serial killings under investigation were noted in connection with press coverage of the crimes.

On January 16, 1992, it was reported that defendant and his wife lost custody of their three-month-old daughter the previous October due to a "near fatal beating," and that defendant had been interrogated concerning the abuse, but no charges had been filed. It was also reported that he was linked to 13 rather than 19 killings. Reports on January 17 added that defendant kept copies of news articles about the murders, was "prone to rages directed at his wife and often was out late at night." On January 18, defendant was "recalled as violent," and it was reported that police hoped to link him to 19 murders. On January 19, one article explored why people are "transfixed by serial killers," and a second article stated that "[t]he bizarre and gruesome circumstances [in this case] fit a classic profile of other serial killing cases." Two days later, an article about defendant's first wife revealed that "their marriage was filled with violence, hatred, and murder." Over the remainder of January 1992, it was reported that a second inquiry into the October 1991 beating of defendant's child had ended due to a lack of evidence concerning who harmed the child; the police stated that defendant was a suspect in two additional murders, but reports that 13 killings had been attributed to him were unsubstantiated; defendant's parents were stunned by the allegations; and a couple with whom defendant had lived questioned his guilt.

Coverage continued to decline after January 1992. In February, the press reported that defendant's arraignment had been delayed, new charges were expected, the case would take years and cost the county millions of dollars, the prosecution was likely to seek the death penalty, defendant's counsel might have a

41

conflict, and defendant had pleaded not guilty to two killings. There were also articles about flaws in the county's system of checking for criminal backgrounds of employment applicants, various events that led to defendant's arrest, defendant's congenial attitude toward friends and coworkers, and the public's fascination with mass killings. Fewer articles appeared in March, and most addressed routine court appearances. It was also reported that another body had been discovered, and that the police had determined the killing was not related to 19 other killings. An article in June stated that "scientific tests linked" defendant to 15 more deaths. At the end of July, the grand jury's indictment of defendant on 14 counts of murder and the crimes against Rhonda Jetmore was reported. Articles included information about evidence linking defendant to the crimes and the condition of some of the bodies when they were discovered. Finally, it was reported that the task force investigating serial killings had been disbanded following the indictments.

Thereafter, coverage was sporadic. Defendant's expert's media log identifies only two more articles in 1992, four in 1993, and 13 in 1994.[7] The articles covered court events, such as defendant's plea, the denial of a suppression motion, and the setting of a trial date. They also addressed DNA testing that was performed to evaluate whether defendant was connected to another homicide; the prosecution of defendant's brother for child molestation; the arrest of the lead Riverside Police Department detective assigned to the homicide task force for

---

[7]    Defendant's expert testified that the log listed "all the newspaper articles that I was furnished," but he added that he was certain he did not have all the articles, and also that some of the articles were duplicates that varied only in the headline and publication in which they appeared.

receiving stolen property; and the murder of an actress who was cast as a prostitute in a film that mentioned defendant.

The reporting was largely factual, and most of the coverage referred to evidence that was ultimately admitted at trial. (See *Farley, supra*, 46 Cal.4th at p. 1083.) In addition, many of the media terms characterized by defendant's expert as "emotional" and "prejudicial" reflected the facts of the case, such as statements referring to a "serial killer" and to victims' being stabbed, strangled, suffocated, bludgeoned, tortured, mutilated, and dumped. "Media coverage is not biased or inflammatory simply because it recounts the inherently disturbing circumstances of the case." (*People v. Harris* (2013) 57 Cal.4th 804, 826.) Although "press coverage need not be inflammatory to justify a change of venue" (*Farley, supra*, at p. 1084), something more than sensational facts has been present in cases in which a change of venue was required. (See *ibid.*) Here, relative to the nature and extent of media coverage, there are no factors weighing in favor of a change of venue other than the sensational facts of the case. In contrast, in *Daniels v. Woodford* (9th Cir. 2005) 428 F.3d 1181, 1210-1212, on which defendant relies, extensive publicity shortly before the trial turned the two police officers whom the defendant had murdered into "posthumous celebrities." A stadium was named after one of the victims, and both were the focus of media coverage of the unveiling of a memorial to fallen officers across the street from the courthouse. In addition, the public reacted passionately to the murders; approximately 3,000 people attended the funerals, and editorials and numerous letters to the editor advocated execution. In this case, media interviews with the families of the victims did not similarly transform the victims into celebrities or heroes.

The passage of time from the early intense media coverage diminished the potential for prejudice. In *People v. Ramirez, supra,* 39 Cal.4th 398, in which the

43

media coverage was described by the trial court as " 'saturation, as much as they possibly can give,' " we observed that "the passage of more than a year from the time of the extensive media coverage served to attenuate any possible prejudice . . . ." (*Id*. at p. 434.) In *People v. Lewis* (2008) 43 Cal.4th 415, many media reports used inflammatory terms, and some revealed inadmissible facts such as the defendant's prior incarceration, his gang affiliations, and his codefendant's confession, as well as prejudicial information concerning his status as a suspect in other offenses and his confessions to several charged murders. In rejecting his claim that a change of venue was required, we noted that "[m]ost of the coverage — and nearly all of the potentially inflammatory coverage — occurred . . . nearly a year before jury selection occurred." (*Id*. at p. 449.) Here, nearly three years passed from the intense coverage in the first few months after defendant was arrested until the time of trial.

Although most of the jurors selected to serve had some familiarity with the facts of the case, "the circumstance that most of the actual jurors have prior knowledge of a case does not necessarily require a change of venue. (See, e.g., *People v. Davis* [(2009)] 46 Cal.4th 539, 580 [all 12 jurors with prior knowledge of the case]; *People v. Ramirez, supra*, 39 Cal.4th 398, 434 [11 jurors with prior knowledge of the case]; *People v. Bonin* (1988) 46 Cal.3d 659, 678, overruled on other grounds as recognized in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1, [10 jurors exposed to media coverage of the case]; *People v. Leonard, supra*, 40 Cal.4th at pp. 1396-1397 [eight jurors with prior knowledge of the case].) 'The relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant.' " (*Famalaro, supra*, 52 Cal.4th at p. 31.) Here, all prospective jurors were asked to respond to questions concerning their knowledge of the case and their reaction to any information they had received. They were

also asked whether they had developed a positive or negative reaction about anyone involved in the case, whether they had any thoughts concerning the truth or falsity of the charges, and whether they had formed any opinions about defendant's guilt or innocence. Finally, they were asked whether they could follow an instruction to disregard anything they had read or heard about the case and base the verdict solely on the evidence and law presented in court. All of the jurors and alternates responded that they could disregard what they had read or heard and decide the case based on the trial.

Defendant contends, however, that this case "falls 'within the limited class of cases in which prejudice would be presumed under the United States Constitution.' " He cites only the media coverage, which we have described above, and the fact that "it was never established that the vast majority of the jury recalled nothing of the case or remembered few details." As we have noted, prior knowledge of a case does not necessarily disqualify a juror. The extraordinary cases in which prejudice has been presumed involve circumstances in which "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." (*Murphy v. Florida* (1975) 421 U.S. 794, 799.) For example, where a 20-minute film of the defendant's confession was broadcast three times in the community where the trial took place, the defendant had essentially been tried in the community of 150,000 rather than in the courtroom. (*Id*. at p. 799.) Prejudice was also presumed where the news media was allowed to overrun the courtroom and create a circus atmosphere. "The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. They cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the

45

crime with which he is charged alone presumptively deprives the defendant of due process." (*Ibid.*; see *People v. Prince* (2007) 40 Cal.4th 1179, 1217-1218.)

Our independent evaluation of the record leads us to conclude that defendant failed to demonstrate that it was reasonably likely that (1) he could not receive a fair trial in the absence of a change of venue, or (2) he did not in fact receive a fair trial. Therefore, denial of defendant's motion for a change of venue did not deprive him of due process of law or a fair trial.

### 3. *Denial of defendant's motion to suppress evidence*

Defendant contends the trial court's denial of his motion to suppress evidence obtained as a result of his warrantless detention and arrest violated his rights under the Fourth Amendment to the United States Constitution and article 1, section 13 of the California Constitution.

#### a. *Facts*

Frank Orta was a police officer for the City of Riverside. On January 9, 1992, he was working as a uniformed motorcycle officer, enforcing traffic laws. At approximately 9:30 p.m., he was driving on University Avenue in Riverside, an area with much prostitution activity, when he observed a gray or silver minivan make a U-turn in a parking lot by a liquor store, and then come to a stop facing University Avenue, with its headlights on. It did not appear to Orta that the occupant of the van was parking in order to conduct business at any of the commercial establishments in the area. Orta was aware of information in a police bulletin concerning an individual and a vehicle suspected to be involved in serial killings of prostitutes in Riverside County. The bulletin described the vehicle as a late model, two-tone, blue over gray, Chevrolet Astro van, and requested patrol officers to collect "field information" regarding any vehicles or suspects matching the descriptions in the bulletin.

46

Upon observing the type of vehicle stopped in the parking lot, Orta intended to find a clear vantage point, observe any activity, and effect a traffic stop if a woman entered the van and the van drove away. A woman, who appeared to Orta to be a prostitute, approached the van and crossed in front of it, through the headlights, but then she noticed Orta, and immediately turned and walked back in the direction from which she had come. The van then began to move.

Orta decided to make contact with the van despite the fact that the woman had walked away, in order to gather information about the driver and the van. When he observed the van leave the lot, he followed it, with the intention to stop it. As he drove behind the van, the driver stopped at a red light. The van and Orta's motorcycle "were positioned to go straight in the lane, . . . [a]nd then the van suddenly made a right turn without any kind of signals or without moving over towards the curb." Orta stopped the van for failing to signal the turn.

Orta then asked the driver for his driver's license and vehicle registration. The driver, whom Orta identified at trial as defendant, produced a driver's license, but stated that he did not have his vehicle registration with him. The license, which identified the driver as "Bill Lee Suff," had expired in August 1991. On the front of the license was an address in Lake Elsinore, but that address had been scratched out. On the back was a second Elsinore address and an address in Rialto. Orta testified that these addresses were significant to him, because some of the victims' bodies had been dumped in the Lake Elsinore area, and one body had been dumped in close proximity to Rialto. Orta also thought that defendant resembled the police artist's sketch of the suspected serial killer.

Orta informed defendant that he had stopped him for his failure to signal his turn, and that defendant's cracked windshield was also in violation of the Vehicle Code. He asked defendant for his current address, and returned to his motorcycle to issue a citation for the Vehicle Code violations. He also contacted a

47

police dispatcher to confirm the status of defendant's driver's license and to determine the status of the vehicle's registration. In response, he learned that the driver's license was suspended and, despite the 1992 registration sticker on the license plate, the vehicle's registration had expired in 1990. Based on this information, Orta decided to impound the vehicle. He testified that when he discovered a vehicle was unregistered for more than a year, he always impounded the vehicle.[8]

Five or six minutes after Orta stopped defendant, while Orta was preparing a citation for the Vehicle Code violations, a notice to the driver that his license was suspended, and an impound storage sheet for the vehicle, Riverside Police Officers Duane Beckman and Don Taulli arrived at his location. They confirmed they were part of the task force assembled to apprehend the serial killer, and Orta informed them of his observations concerning defendant and defendant's driver's license. He requested their assistance in conducting an inventory of the vehicle prior to its being impounded and towed. He confirmed at trial that Riverside Police Department policy requires that an inventory of a vehicle be conducted prior to the vehicle's being impounded and stored.

Among the items found in the van during the inventory search were wire-rimmed glasses, a parole card with defendant's name on it, a black notebook that

---

[8]    At the time Orta impounded defendant's van, Vehicle Code section 22651, subdivision (*o*), authorized a peace officer to remove a vehicle found upon a highway, public land, or a parking facility if the vehicle's registration had expired more than one year before the vehicle was found. (As amended by Stats. 1991, ch. 189, § 40, pp.1474, 1476.) In addition, former subdivision (p) authorized the removal of a vehicle when an officer issued a citation for driving with a suspended or revoked license, and there was no passenger in the vehicle licensed to drive. (*Id*., p. 1477.)

looked like a Bible, blankets, and numerous pieces of cord.  In response to a question from Officer Beckman, defendant stated that he was on parole in Texas.  Beckman recalled that the police bulletin mentioned that there was a Bible on the console of the suspect's van.  When Officer Taulli found what appeared to be a firearm in a holster, Officer Beckman informed defendant he was under arrest for possession of a firearm, and he placed handcuffs on defendant.  At this point, approximately 10 minutes had passed since Beckman and Taulli had arrived on the scene.  Defendant informed Beckman that the item they had found was a pellet gun, and the officers removed it from its holster and determined it was a pellet gun.  Officer Taulli then found a "fishing-type" knife in the van, and Beckman informed defendant he was still being arrested for parole violation and having a fixed-blade knife.

Taulli informed Beckman that it looked like there was blood on the knife, and Beckman then contacted the sergeant in charge of the special surveillance operation that evening and informed him of the information they had gathered.  The sergeant then contacted Detective Christine Keers, who asked what brand of tire was on the front wheel of the driver's side of the van.  After Taulli informed the sergeant that it was a Yokohama brand tire, the officers were instructed to secure the scene and wait for the detective.  Keers arrived at the scene approximately 20 minutes later.  After Keers determined that the passenger side tires were Uniroyal brand, she introduced herself to defendant, at which point she noticed that he was wearing Converse tennis shoes, and she asked him for permission to search his van, which he gave.  Inside the van, she found fibers that were consistent with fibers found at some of the crime scenes.  Keers then requested that defendant be transported to the police station for questioning regarding the serial killings.  Approximately 15 to 20 minutes had passed between Keers's arrival and her request that defendant be transported.

49

Defendant moved to suppress the evidence obtained as a result of the traffic stop on the grounds that the stop, detention and search of his vehicle were unlawful, and his arrest was without probable cause. His initial theory was that the stop based on a violation of the Vehicle Code was a pretext to search for evidence of other crimes. The People opposed the motion, asserting that (1) Orta had a reasonable suspicion to stop the vehicle, based on the activity observed near the liquor store and facts known concerning a serial killer, (2) the stop of the van for the failure to signal was lawful, (3) the detention was not unduly prolonged, (4) the inventory search of the van was lawful, and (5) the evidence seized would inevitably have been discovered. Defendant filed a supplemental brief, asserting that (1) Orta had no reasonable suspicion to stop the vehicle, and (2) defendant had not violated Vehicle Code section 22107 because that provision requires use of a turn signal "in the event any other vehicle may be affected by the [turn]," and there was no other vehicle that could have been affected by defendant's turn.

The trial court found that "Officer Orta had articulable reasonable suspicions of criminal activity under the totality of circumstances," citing Orta's familiarity with the activity of prostitutes on University Avenue, and his knowledge of the type of vehicle thought to be used by a serial killer, which matched the type he believed was occupied by someone who was attempting to solicit a prostitute. The court also found that Orta "objectively could have stopped the vehicle for an improper turn, turning without a signal." The court further concluded that once Orta stopped the van, he properly determined the status of defendant's driver's license and vehicle registration, and then properly discovered other information, without unduly prolonging the detention. Therefore, the trial court denied the motion to suppress the evidence gathered as a result of the traffic stop.

50

### b. Analysis

"A defendant may move to suppress evidence on the ground that '[t]he search or seizure without a warrant was unreasonable.' (§ 1538.5, subd. (a)(1)(A).) A warrantless search is presumed to be unreasonable, and the prosecution bears the burden of demonstrating a legal justification for the search. [Citation.] 'The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment.' " (*People v. Redd* (2010) 48 Cal.4th 691, 719 (*Redd*); see *People v. Williams* (2013) 56 Cal.4th 165, 184; *People v. Ayala* (2000) 24 Cal.4th 243, 279.)

" 'A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity.' [Citation.] Ordinary traffic stops are treated as investigatory detentions for which the officer must be able to articulate specific facts justifying the suspicion that a crime is being committed." (*People v. Hernandez* (2008) 45 Cal.4th 295, 299 (*Hernandez*).) The motivations of the officer are irrelevant to the reasonableness of a traffic stop under the Fourth Amendment. (*Whren v. United States* (1996) 517 U.S. 806, 813.) "All that is required is that, on an objective basis, the stop 'not be unreasonable under the circumstances.' " (*United States v. Mariscal* (9th Cir. 2002) 285 F.3d 1127, 1130 (*Mariscal*).)

Defendant contends that (1) the Vehicle Code did not require him to signal his turn, and (2) the events witnessed by Officer Orta prior to defendant's departure from the liquor store parking lot did not justify a suspicion that a crime

was being committed. For the reasons set forth below, we conclude defendant violated the Vehicle Code when he failed to signal his turn, and Officer Orta was authorized to detain him, demand his driver's license and vehicle registration, and impound and search his vehicle, both because defendant's license was suspended and because the vehicle's registration had expired more than a year earlier. Therefore, we need not and do not address whether other circumstances also justified the traffic stop.

With respect to his contention that he was not required to use a turn signal when he made the turn immediately preceding his detention, defendant first relies on Vehicle Code section 21453, which describes the circumstances in which a driver who is facing a red traffic light is authorized to turn, but does not mention any requirement that the driver signal the turn.[9] He acknowledges Vehicle Code section 22107's requirement that a driver signal a turn,[10] but notes that Vehicle Code section 22108 requires that the signal "be given continuously during the last 100 feet traveled by the vehicle before turning," and asserts that "[w]hen motorists form the intent to turn after coming to a complete stop at a red light, . . . it is physically impossible to comply with the provisions of section 22108 by giving a continuous signal during the last 100 feet traveled by the vehicle. Under these

---

[9]     The People contend defendant forfeited his contention that Vehicle Code section 21453 authorized his turn without a signal because he did not rely on this particular statute in the trial court. Because his argument raises only an issue of law, we may consider it despite the fact that it was raised for the first time on appeal. (*People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 195.)

[10]    Vehicle Code section 22107 provides: "No person shall turn a vehicle from a direct course or move right or left upon a roadway until such movement can be made with reasonable safety and then only after the giving of an appropriate signal in the manner provided in this chapter in the event any other vehicle may be affected by the movement."

circumstances, there is simply no obligation under California law to give a signal of any kind."

Defendant claims the legislative history of these statutes supports his theory. He notes that in the same year that the Legislature added the Vehicle Code provision authorizing a turn at a red light (Veh. Code, former § 476 [right-on-red rule], added by Stats. 1947, ch. 1256, § 3, p. 2769), the Legislature amended the predecessor to Vehicle Code section 22107, the statute that requires a turn signal, to add the phrase "from a direct course or move right or left upon a roadway." (Veh. Code, former § 544 [entitled "Turning Movements and Required Signals"], as amended by Stats. 1947, ch. 875, § 5, p. 2053.) He contends that the provision authorizing a right turn on a red light "conflicted with [former Vehicle Code] section 544, which required a signal at all turns. How could a driver who decided to turn after stopping at a red light comply with section 544 by continuously signaling an intention to turn for a specified distance? Therefore, [former Vehicle Code] section 544 was amended in the same legislative session to provide that a signal is required only when a vehicle turns 'from a direct course or move[s] right or left upon a roadway.' Whereas all turns had theretofore required a signal, the amendment made clear that the statute only required vehicles turning from a direct course (i.e., moving) or those moving right or left on a public roadway (i.e., changing lanes) to give a signal of an intention to turn."

There was, however, no conflict in 1947 between the requirement to signal all turns and the authority to turn right at a red traffic signal, nor is there any conflict between the current provisions concerning signaling (Veh. Code, §§ 22107, 22108) and those related to turning at a red light (Veh. Code, § 21453). The provisions concerning signals require the driver to signal a turn, and the right-on-red provisions address when a driver may turn despite a red light. The extension or clarification of the provisions concerning signaling to encompass

53

both a turn "from a direct course" and a "move right or left upon a roadway" reflects that the signaling requirements apply to lane changes as well as changes of course; it does not reflect a legislative intent to require a signal only if the driver decides to turn before reaching a red light. Defendant cites no authority for the proposition that a "direct course" refers only to vehicles that are moving, nor does he suggest any reason the Legislature would provide that a turn signal is not required before a vehicle turns at a red light. Finally, nothing in these statutes concerns the timing of a driver's decision to turn.

Alternatively, defendant contends that he was not required to signal his turn because Vehicle Code section 22107 states that a signal is required "in the event any other vehicle may be affected by the movement," and there was no vehicle that could have been affected by defendant's turn. Essentially the same argument was made in *People v. Logsdon* (2008) 164 Cal.App.4th 741, in which a police officer, who was driving behind the defendant in the same lane, stopped the defendant for failing to signal a lane change. In rejecting the defendant's contention that no vehicles could have been affected by his lane change, *Logsdon* observed that "a signal is primarily aimed at vehicles behind the car making the lane change." (*Id.* at p. 744.)

Defendant asserts, however, that because Orta's motorcycle was *stopped* behind defendant's van, the motorcycle could not have been affected by defendant's turn. In support of this theory, he cites *Mariscal, supra*, 285 F.3d 1127, which involved Arizona's law that a signal is required " 'in the event any other *traffic* may be affected by the movement.' " (*Id.* at p. 1131, italics added.) In *Mariscal*, patrol officers had been notified of the defendant's route, and they positioned themselves at an intersection toward which the defendant was driving. At that intersection, the defendant made a right turn without signaling the turn, and the officers then had to make a U-turn to follow him to make a traffic stop. The

54

Ninth Circuit invalidated the stop, concluding that the stationary police vehicle was not in "traffic" within the Arizona law's definition of traffic, which required "us[e of] a highway for purposes of travel." The court concluded that the stationary vehicle was not traveling, based on a dictionary definition that suggested that "traffic" involves "circulation" or "flow" or "movement." (*Id*. at p. 1132.) The court added that even if the officers were in "traffic," they could not have been "affected" by the defendant's turn, which was made on the other side of the intersection from where the officers were parked.

*Mariscal* is distinguishable. First, Vehicle Code section 22107 refers to whether a "vehicle" may be affected rather than whether "traffic" may be affected. Second, Orta was behind defendant's vehicle, not stationed across an intersection as were the police in *Mariscal*. Third, Orta was clearly in a position to be affected by defendant's turn; had Orta decided to proceed to the right of defendant's van to make a right turn, he would have done so without knowing that defendant was planning to turn right into the same path.

In sum, defendant was required to signal that he was going to turn at the intersection, and his failure to do so justified Officer Orta's traffic stop. (See *Hernandez, supra*, 45 Cal.4th at p. 299.) The officer was then authorized to require defendant to produce his driver's license and evidence of registration of his van. (*Redd, supra*, 48 Cal.4th at p. 719.) Upon determining that the registration of defendant's van had expired more than a year earlier, the officer was authorized to impound the van. (Veh. Code, § 22651, former subd. (*o*)(1); *Redd, supra*, at p. 721.) Having impounded the vehicle, Orta was authorized to conduct an inventory "aimed at securing or protecting the car and its contents." (*South Dakota v. Opperman* (1976) 428 U.S. 364, 373.) For these reasons, we conclude the trial court did not err in denying defendant's motion to suppress the evidence obtained as a result of the traffic stop.

## 4. Denial of defendant's discovery requests

Defendant contends that the denial of discovery concerning murders of prostitutes with which defendant was not charged and concerning any profile of the killer prepared by law enforcement violated his right to a fair trial and an intelligent defense under the due process clause of the Fourteenth Amendment to the United States Constitution. He also contends that the prosecutor's refusal to produce this information constituted prosecutorial misconduct.

### a. Facts

#### i. Discovery related to killings of other prostitutes

In May 1993, defendant sought discovery of information related to six other killings of prostitutes, including one committed after defendant was arrested and with which a different person had been charged. The People opposed discovery on the grounds that (1) the other cases remained under investigation and the information was therefore privileged, (2) the privacy rights of the families of the victims in the other cases were "compelling," and (3) the information was not relevant unless the defense could identify the perpetrator of the other crimes. At the hearing on the motion, defense counsel stated that the defense was seeking "the same types of things that would be available to use were these people on the charged indictment," and asserted that the information sought "could be relevant in the defense to say that . . . these killings are so similar and yet there is clearly an exclusion, perhaps, of [defendant] from them."

The trial court stated that the defense had to "show . . . more specificity than . . . simply because they were prostitutes killed during the same timeframe." The defense responded that "some analysis of the type of investigation that occurred" was needed before its relevancy could be judged. The trial court suggested that it was appropriate to rely on the prosecution to fulfill its sworn duty and obligation to produce relevant information. The defense responded that each

56

side was biased, and that the trial court must review the materials and make a determination. The court stated that the defense's proposal "is not a solution . . . because I have no idea of what has gone before . . . ." The court ordered that "if there's any known exculpatory information as to the charged crimes against [defendant], I'm ordering that be divulged."

In August 1994, defendant renewed his motion to compel discovery with respect to two prostitutes whose bodies were found in the Riverside area after defendant was arrested. Cheryl Clark had died from strangulation and stabbing and was dumped in a trash receptacle, and Janine Sheppard had been dumped in a dirt alley. The prosecution represented that it intended to abide by the trial court's earlier order to produce exculpatory information. It further stated that another man had been convicted of Clark's murder, and that bodily fluid analyses in connection with that crime had excluded defendant as a semen donor. With respect to Sheppard's murder, the prosecution reiterated that it would produce any exculpatory evidence, but added that releasing all of the evidence in that case would compromise the investigation. At the hearing, the prosecutor stated that "[w]e are well aware of the types of information that [defense counsel] is looking for in this kind of case. If we find it, we will provide it." The trial court indicated with respect to discovery of the reports in the Sheppard case that "you'd have to find the perpetrator. And I don't think that's what we're about." It added that the prosecution had "an obligation to keep these things secret for their ongoing investigation." The court then observed that the information related to the Sheppard case was part of an ongoing investigation and could be withheld if its disclosure would jeopardize that investigation, and for those reasons denied discovery "at least at this time." With respect to the Clark case, the court noted that the case had been tried in open court, and suggested that the defense talk to

57

counsel in the Clark case and determine whether there were similarities. The court also directed the prosecution to review both of the cases again.

*ii. Discovery related to serial killer profiles*

The defense also sought discovery of any profile that had been prepared by a law enforcement agency with respect to the investigation of a serial killer of prostitutes. At the June 1993 hearing on the matter, the prosecutor asserted that any psychological profile was irrelevant, and declined to state whether one existed. The trial court agreed that, as of that point in time, any profile was irrelevant. In May 1994, following renewed requests for any profile, the trial court stated that it would deny any request for a profile, and noted that the defense had already received the reports from which any profile would have been developed. The court added that further investigation that brought up new evidence might be discoverable, but "some configuration or some probability chart" based on the accumulated reports would not be discoverable. It concluded that "everything is available to you to develop for either phase through your own expert."

In May 1995, during trial, the prosecution filed a motion to introduce expert testimony by a member of the National Center for Analysis of Violent Crime of the FBI. The motion disclosed that the center "maintains a computer database analysis unit called V.I.C.A.P., the Violent Criminal Apprehension Program. The program was employed before the arrest of the defendant in this case." The testimony was offered to establish that the crimes were committed by a single individual, based on such evidence as the selection of primarily White female prostitutes, the commission of the killings and the disposal of the bodies outside the "comfort zones" of the perpetrator's home or business, the binding of victims to prolong contact with them, the "unusual inputs" into the killings such as mutilation and postmortem stabbing, and the unusual pattern of body disposal

58

(e.g., nude or partially nude bodies in posed positions) in visible places in a manner to draw attention. The trial court denied the prosecution's motion on the ground that the evidence's prejudicial effect outweighed its probative value. (Evid. Code, § 352.)

The prosecution again sought to admit expert evidence regarding the profile at the penalty phase in response to defendant's evidence of his good character. The defense objected, and the trial court excluded the testimony on the ground that it was not proper rebuttal evidence.

### b. Analysis

"A public entity has a privilege to refuse to disclose official information" (Evid. Code, § 1040, subd. (b)) if "[d]isclosure of the information is against the public interest because there is a necessity for preserving the confidentiality of the information that outweighs the necessity for disclosure in the interest of justice . . . ." (*Id.*, subd. (b)(2).) "Ongoing investigations fall under the privilege for official information." (*People v. Jackson* (2003) 110 Cal.App.4th 280, 287; see Pen. Code, § 1054.7 ["possible compromise of other investigations by law enforcement" constitutes good cause to deny, restrict, or defer disclosure].)

A trial court has discretion to deny disclosure not only when the necessity for confidentiality outweighs the necessity for disclosure, but also "when there is an ' "absence of a showing which specifies the material sought and furnishes a 'plausible justification' for inspection [citations]." ' " (*People v. Kaurish* (1990) 52 Cal.3d 648, 686 (*Kaurish*).) The trial court's ruling is reviewed under the abuse of discretion standard. (*People v. Prince, supra,* 40 Cal.4th at p. 1232.) Here, regardless of whether defendant sought to prove a third party culpability theory or to disprove the prosecution's serial murderer theory, the trial court did

not abuse its discretion in concluding that defendant did not sufficiently specify the material sought.

To be exculpatory as third party culpability evidence, the information sought would have to assist defendant in establishing that the uncharged prostitute killings were committed by a third party who was directly connected to a charged crime. (*People v. Hall* (1986) 41 Cal.3d 826, 832 [third party culpability evidence must tend to directly connect the third party to the commission of the charged crime]; *People v. Littleton* (1992) 7 Cal.App.4th 906, 911 ["Because no one had been arrested or charged with those other crimes . . . , the information in the reports would have been of no value to the defendant unless he was able to *solve* the other crimes and identify the perpetrator"].) Defendant did not identify any such information.

To be exculpatory with respect to the prosecution's serial murderer theory, the information sought would have to assist defendant in establishing that he was not responsible for an uncharged killing and the killing was sufficiently similar to the charged crimes to tend to rebut the prosecution's theory that all of the charged homicides were committed by the same person.[11] The prosecution's serial murder "linkage" theory was based on numerous similarities among the charged homicides, including binding, mutilation, postmortem stabbing, disposing the bodies in a manner indicating they were intended to be found, and posing and re-dressing some victims. In addition, the charged homicides were connected by

---

[11] The Attorney General asserts defendant did not present this theory of relevancy in the trial court. Although defendant's legal arguments in support of his motions for discovery focused on the possibility that the reports would lead to evidence that a third person was involved in the crimes, his arguments at the hearing were somewhat broader and arguably raised this theory.

numerous commonalities in the forensic evidence, including tire treads, fibers, and hairs. Defendant did not identify any factors other than that the uncharged killings involved drug-addicted prostitutes whose bodies were dumped.

Defendant complains that he could not demonstrate additional specificity without reviewing the police files regarding the uncharged homicides. Given the numerous distinctive facts associated with the charged murders, the specific details one would look for in connection with the uncharged crimes were obvious — the similarities that supported the prosecution's serial murder theory.

Despite the trial court's statement that the defendant would have to show greater specificity to obtain discovery, and the court's observation that having the court review the files would be of no assistance to the process because the court was not familiar with the evidence of the charged crimes, defendant did not describe the discovery sought with any greater specificity. Thus, it appears defendant sought to undertake a proverbial fishing expedition. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 957 ["defendant's showing of need . . . was based upon speculation and constituted the proverbial fishing expedition"]; see also *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 538 [noting that "the documents have been requested with adequate specificity to preclude the possibility that defendant is engaging in a 'fishing expedition.' "].) Because defendant failed to describe the information sought with greater specificity, the trial court did not abuse its discretion in denying discovery of the police files. (See *Kaurish, supra*, 52 Cal.3d at pp. 686-687 [because defendant failed to provide greater specificity than " 'police reports pertaining to child molestation killings in the Hollywood area' for the six months preceding and following the murder," trial court did not abuse its discretion in denying discovery request].)

Defendant complains that, "based solely on the prosecutor's judgment that there was nothing about the investigations which would be of assistance to

[defendant] in preparing and presenting a defense, the judge determined that the government had met its burden of demonstrating the privilege." This contention conflates the issues of privilege and relevance. Although the trial court acknowledged the privilege that applies to ongoing investigations, it concluded that the defense would have to demonstrate more specificity than the mere fact that "they were prostitutes killed during the same timeframe." The court also noted the prosecution's duty to produce all exculpatory evidence (§ 1054.1, subd. (e); *Brady v. Maryland* (1963) 373 U.S. 83, 87; see *People v. Jenkins, supra*, 22 Cal.4th at pp. 952-954), and ordered the prosecution to divulge all exculpatory information. Because the prosecution did not identify any exculpatory evidence, there was no occasion for the trial court to conduct an in camera review of the investigatory files to evaluate a claim of privilege. The fact that the prosecution asserted that the files were confidential does not alter the analysis.[12]

---

[12] Defendant asserts that the People are barred by the doctrine of judicial estoppel from contending that the trial court could deny the motion to compel discovery without holding an in camera review, because the People conceded in *People v. Jackson, supra,* 110 Cal.App.4th at page 284, that the trial court erred in that case when it denied a discovery motion without conducting an in camera review to determine whether police files related to uncharged crimes contained exculpatory evidence. Without deciding whether the doctrine may apply against the prosecution in a criminal action (see *People v. Watts* (1999) 76 Cal.App.4th 1250, 1262 [stating that the doctrine apparently had never been applied against the prosecution]), we note that the circumstances here do not satisfy various criteria for application of the doctrine. The Attorney General's earlier *concession* of a legal point does not constitute the successful assertion of a position. In addition, there is no showing that the earlier position was not the result of ignorance, fraud, or mistake, and there is no indication that the Attorney General's decision to contest the legal issue in this proceeding reflects an abuse of the judicial process. (See *Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987; *Swahn Group, Inc. v. Segal* (2010) 183 Cal.App.4th 831, 842-851; *People v. Watts, supra*, 76 Cal.App.4th at p. 1261; *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 183.)

With respect to the request for any profile of serial murderers, defendant contends he established below that a profile could lead to admissible evidence. He cites his response to the trial court's statement that any profile "could be way off base." He responded that the profile "could be absolutely right about some of them, that's just it. It might lead to some introducible evidence." Defendant's assertion that the profile might have been accurate did not explain how it would lead to admissible evidence. He also contends that he adequately established that the profile might "assist in developing alternate suspects and defense theories." His theory appears to be that if he had access to law enforcement's profile information, the defense could have tried to find a third party who fit that profile and thereby perhaps find the evidence that someone else killed the victims in this case. Defendant's theory that a profile of the characteristics of a person who might have committed the 19 killings, if accurate, would have led the defense to the killer, is purely speculative.

Finally, defendant asserts that the prosecution's failure to disclose the profile and its failure to provide to the defense the serial murderer linkage evidence 30 days before trial as required by section 1054.7 deprived defendant of due process of law and constituted prosecutorial misconduct. Although the prosecution declined to state whether there was a profile, the trial court denied the discovery request, and we have found no error in its ruling. In addition, the trial court declined to admit evidence of the profile. Therefore, the prosecutor's statements concerning the existence of any profile did not deprive defendant of his due process rights or constitute prosecutorial misconduct.[13]

---

[13] The People assert defendant forfeited this claim of prosecutorial misconduct by failing to raise it and seek appropriate sanctions in the trial court,

*(footnote continued on next page)*

**B. Guilt Phase Issues**

### 1. *Exclusion of defense evidence*

Defendant contends the exclusion of evidence that (1) the murders of prostitutes continued after he was arrested and (2) Detective Christine Keers, the lead Riverside Police Department detective assigned to the homicide task force, was charged with various crimes and terminated from the police force, violated his rights to present a defense, to a fair trial, and to reliable guilt and penalty determinations under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 7, 15, 16, and 17 of the California Constitution.

### a. *Evidence of continued killings of prostitutes*

Although unsuccessful in obtaining the records of police investigations of the murders of other prostitutes, defendant moved to present evidence of the murders of three prostitutes in Riverside County that occurred after he was arrested. He asserted the evidence was relevant in light of the view expressed by some prospective jurors that the murders had stopped when defendant was arrested, and also as third party culpability evidence. With respect to the latter purpose, he complained that the lack of discovery concerning other murders limited his ability to link a third person to the charged crimes. At the hearing, the defense stated that it learned from newspapers, from "informal discussions with various people in law enforcement," and from defense investigators that there were three killings of prostitutes who were drug users and whose bodies had been

_____

*(footnote continued from previous page)*

but as defendant notes, it would have been futile to raise the issue because the trial court had ruled that the prosecution was not required to produce any profile.

64

dumped in "alleys, hillsides, open area, or something like that." The prosecutor confirmed that he had discussed two of the postarrest murders with the investigating detectives (the third murder had just occurred), and stated that there was no information that would exculpate defendant. He also stated the two victims were prostitutes and probably drug users, but "[t]here were a lot of dissimilarities in the cases . . . with respect to the 13 charges that [defendant] has been accused of committing." He added that he did "not intend to argue to this jury that [defendant] is guilty because once he was arrested, the killing of prostitutes stopped in Riverside County. What I intend to argue is the weight of the evidence that points specifically to [defendant] as killing these 13 women." The trial court denied the motion, stating that there was no link and there was nothing to show that the fact there were three other killings of prostitutes had any relevance to this case.

We first consider whether the evidence was admissible as third party culpability evidence. " '[T]o be admissible, evidence of the culpability of a third party offered by a defendant to demonstrate that a reasonable doubt exists concerning his or her guilt . . . must link the third person either directly or circumstantially to the actual perpetration of the crime.' " (*People v. Elliott* (2012) 53 Cal.4th 535, 580.) "For evidence of an uncharged offense to be admissible to establish the third party's identity as the perpetrator of the charged crimes, ' "[t]he pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." ' [Citations.] A large number of common marks may, when viewed in combination, establish the required distinctive pattern." (*Id*. at p. 581; see *People v. Page* (2008) 44 Cal.4th 1, 39 [right to present all evidence of a significant probative value is not "inconsistent with the rule . . . that third party culpability evidence is admissible only if it links a third party to the crime"].)

65

The evidence that, after defendant was arrested, three prostitutes, at least two of whom abused drugs, were fatally stabbed and whose bodies were dumped like trash, does not establish a link between a third person and the crimes charged against defendant. None of these shared characteristics is unusual or distinctive. As the prosecutor noted, prostitutes are vulnerable and tend to be victimized. (See, e.g., *People v. Jones* (2013) 57 Cal.4th 899 [two and perhaps three homicide victims were prostitutes, and the three had been left in dumpsters]; *People v. Solomon* (2010) 49 Cal.4th 792, 798 [six drug-abusing prostitutes murdered]; *People v. Doolin* (2009) 45 Cal.4th 390, 400 [defendant murdered two prostitutes and attempted to murder four more prostitutes]; *People v. Rogers* (2006) 39 Cal.4th 826, 835 [two prostitutes murdered]; see also *People v. Jennings, supra,* 53 Cal.3d at p. 363 [noting that prostitutes "could be seen as especially vulnerable"].) Therefore, the trial court did not abuse its discretion in excluding this evidence.

We next consider whether the evidence was admissible to prove the bare fact that the murders of prostitutes did not end with defendant's arrest. Defendant asserts that the prosecutor, by arguing that defendant was guilty because he was the serial killer responsible for all of the charged killings, "reinforced the jury's predisposition" to believe that the killings of prostitutes stopped when defendant was arrested. Therefore, he contends, the evidence of postarrest killings was relevant to rebut the jury's belief. We disagree. Because no evidence was presented that similar murders of prostitutes ended upon defendant's arrest, and no element of the charges otherwise raised an issue of whether the murder of prostitutes continued after defendant's arrest, the evidence was not relevant to the issue of guilt. The fact that a number of prospective jurors, none of whom was selected as a juror in this case, made statements in the course of jury selection that

66

reflected a belief that the murders had ended with defendant's arrest, does not render the evidence relevant to the issues litigated.

Finally, we consider defendant's contention that the evidence was relevant to rebut the prosecutor's argument that defendant was guilty based on the pattern of killings. The prosecutor's theory was not based on the fact that the victims were all drug-abusing prostitutes whose bodies were dumped. Rather, his argument relied on the repeated patterns of evidence, including the tire impressions at multiple scenes that matched the tires that were on defendant's van at the time of the particular killing, the shoe impressions that were similar to two pairs of Pro Wings and a pair of Converse shoes defendant purchased over the course of these killings, and the various fibers associated with multiple victims that were similar to fibers in his van. As the prosecutor explained to the jury, "It's this cross-association of evidence that in and of itself, if you look at in a vacuum, may not be that significant. But when you look at the big picture . . . we see continual patterns that repeat themselves with respect to many different types of evidence." The fact that drug-abusing prostitutes continued to be killed and dumped did not rebut the prosecution's theory.

### b. Evidence of criminal charges against lead detective and her discharge from the police force

The prosecution moved to exclude impeachment evidence related to crimes allegedly committed by Christine Keers, the lead homicide task force detective. Keers was indicted by a Riverside County grand jury in October 1994 on three counts of attempting to violate section 496, subdivision (a), receiving stolen property, a misdemeanor, and one count of violation of section 653f, soliciting the commission of a burglary, a felony. Keers was put on administrative leave in August 1994, and terminated from the Riverside Police Department in December 1994, but she had not been tried for the alleged crimes prior to defendant's trial,

67

which began in February 1995.  According to the motion, Keers would be called by the prosecution to testify concerning (1) her recording of an interview with Kelly Whitecloud, the friend of Kelly Hammond, (2) her involvement in the tape-recorded interview of defendant after his arrest, and (3) her recovery of items of clothing and jewelry that belonged to victims.  The prosecution stated that her testimony was "important to maintain the flow and continuity of the presentation of evidence," but "virtually every fact she will relate has a second percipient witness who can testify to the same facts."  It noted that if the defense sought to challenge the evidence Keers would convey, Kelly Whitecloud could be cross-examined, the recording of the interview of defendant could be played, and the individuals from whom Keers had collected personal belongings of the victims were available.

At the hearing on the motion, the prosecution argued that because Keers had not been convicted of the alleged crimes, admission of the evidence would require a mini-trial of the allegations.  It also stated that the primary witness against Keers had died, portions of the audio recordings of that witness's conversations with Keers were inaudible, and there might be an entrapment defense by Keers.  The prosecution also noted that Keers's termination from the police department involved standards and factors different from the criminal charges, and that neither the prosecution nor the defense had knowledge of the internal affairs investigation that had been conducted.  The prosecution asserted that admitting the evidence would lead to "nitpicking wars over collateral credibility" of a witness who was "simply a receiver of information in this case." The defense stated that a trial of the charges was not necessary; instead, the defense should be allowed to ask whether Keers had been indicted by a grand jury for receiving stolen property and whether she had been terminated from the police department.

The court stated that in its view, presentation of the impeachment evidence would become a mini-trial on the issue, because the percipient witness in the Keers matter was deceased and multiple witnesses would be required to prove the charged event. It concluded that "this would be so time consuming" when considered in the context of a witness who was not the sole witness as to the topics of her testimony, and hence the court granted the prosecution motion and excluded the impeachment evidence under Evidence Code section 352.

The defense subsequently sought permission to introduce evidence that Keers had been terminated from her employment in the police department. The trial court stated that it did not know why Keers was terminated, and that the evidence, "left dangling like that," was irrelevant.

Defendant contends the trial court abused its discretion in determining that the probative value of the evidence was outweighed by the undue consumption of time required to prove wrongdoing by Keers. "A trial court's exercise of discretion under section 352 will be upheld on appeal unless the court abused its discretion, that is, unless it exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 806.)

Defendant identifies various facts to highlight the importance of the impeachment evidence. He complains that Keers was allowed to testify regarding her career at the police department, leading the jury to believe that she was a trusted, upstanding officer who would not lie to the jury. He asserts that Keers's testimony concerning her interaction with Kelly Whitecloud was not corroborated, and that the jury had reason to doubt the veracity of Whitecloud because she was a prostitute, a drug user, and a felon who had admitted an intent to "rip off" the driver of the van the night Kelly Hammond disappeared. He identifies various inconsistencies between Whitecloud's testimony at trial and statements she made to various police detectives and the grand jury. He asserts that if the jury had

69

known of the charges against Keers and the termination of her employment, it "would have had reason to seriously consider that either Whitecloud or Keers, or both, were not telling the truth and that the police had arrested the wrong man."

The trial court did not abuse its discretion in concluding that proof of the criminal charges against Keers would have required an undue consumption of time. Proof of the charges was complicated by the death of the percipient witness, and the value of the impeachment evidence was low, given that all of Keers's testimony could be corroborated. Any concern with Whitecloud's corroboration of Keers's testimony is mitigated by the fact that most of the information provided by Whitecloud to Keers about the man who picked up Hammond was memorialized by Keers before defendant was identified as a suspect. Following defendant's arrest, Keers presented two photographic lineups to Whitecloud, and Whitecloud picked defendant from each as the man who took her to McDonald's and then picked up Hammond, but at trial, the McDonald's manager also identified defendant as the man who was with Whitecloud that night. Finally, the unexplained fact that Keers had been terminated from the police department was irrelevant.

### 2. *Failure to exclude evidence obtained during police questioning of defendant*

Defendant contends the police continued questioning him after he requested counsel, in violation of his privilege against self-incrimination under the Fifth Amendment to the United States Constitution, and that evidence obtained as a result of that questioning should have been excluded.

Defendant was arrested on January 9, 1992, between 10:00 p.m. and 10:30 p.m., for a violation of parole, and transported to the Riverside Police Department. Detective Keers began interrogating him approximately two hours later, at 12:30 a.m. on January 10. She gave him the *Miranda* warning and waiver

70

(*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*)), which he signed, and then he asked, "Do I need a lawyer?" She responded, "Well, I don't know. Do you need a lawyer?" He said, "I don't know. For what I've done, I don't see why I need a lawyer." Keers then said, "And all I'm doing is asking you to talk to me. Do you want to do that?" He said, "Okay."

The first phase of the interrogation continued until 1:10 a.m., at which time a technician arrived to collect hair and saliva samples. The interview resumed and continued until 2:45 a.m. During this early morning interrogation, Keers asked defendant for permission to search his home. By this time in the interrogation, the topics of prostitute killings, the knives in defendant's van, footprints, and defendant's Converse sneakers had been discussed. Defendant responded to the request to search his home by stating, "I need to know, am I being charged with this, because if I'm being charged with this I think I need a lawyer." Keers stated, "Well at this point, no you're not being charged with this," and defendant then consented to a search of his apartment.

Questioning resumed that afternoon at 2:50 p.m. and continued until 5:40 p.m. During this questioning, defendant admitted he had been in the orange groves and that there was a body in the orange groves. When pressed to tell them "about the body you left there," he said, "I better get a lawyer now. I better get a lawyer, because you think I did it and I didn't." Questioning continued, and defendant admitted taking a knife out of Casares's chest and putting it in his van.

In May 1995, defendant moved to exclude "defendant's admission that he was in the orange grove where Eleanor Casares' body was found, saw the body, and pulled the knife out of her chest and kept it . . . ." The trial court ruled that defendant invoked his right to an attorney when he stated, "I better get a lawyer now. I better get a lawyer, because you think I did it and I didn't." Therefore, his statements about removing the knife and putting it in his van were excluded.

71

Defendant contends that he invoked his right to counsel earlier, during the morning session when he stated, "if I'm being charged with this I think I need a lawyer."

"In order to invoke the Fifth Amendment privilege after it has been waived, and in order to halt police questioning after it has begun, the suspect 'must *unambiguously*' assert his right to silence or counsel. [Citation.] It is not enough for a reasonable police officer to understand that the suspect *might* be invoking his rights. [Citation.] Faced with an ambiguous or equivocal statement, law enforcement officers are not required under *Miranda, supra,* 384 U.S. 436, either to ask clarifying questions or to cease questioning altogether." (*People v. Stitely* (2005) 35 Cal.4th 514, 535; see *Davis v. United States* (1994) 512 U.S. 452.) Because defendant's statements are undisputed, we independently determine whether he unambiguously asserted his right to counsel. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

Defendant contends that his statement — "I need to know, am I being charged with this, because if I'm being charged with this I think I need a lawyer" — was an unambiguous invocation of his right to counsel. He asserts that "Keers simply could not have interpreted this as a conditional request because she knew that the condition was virtually certain to manifest itself." He proposes that Keers could have asked the prosecutor, who was monitoring the interrogation from another room, whether defendant was going to be charged, and "then could have explained [defendant's] status to him truthfully . . . ."

Defendant acknowledges that in *People v. Gonzalez* (2005) 34 Cal.4th 1111 (*Gonzalez*), we held that a similar statement was not an unambiguous invocation of the right to counsel. In *Gonzalez*, the defendant told the interrogating detectives that if he was going to be charged with anything, he wanted to talk to a public defender. One of the detectives informed Gonzalez that he would be booked that

72

evening, but if polygraph results indicated he was telling the truth, he would be released. Gonzalez asked, " 'Book me on what?' " The detective responded " 'On murder. That doesn't mean you're going to be filed on.' " (*Id.* at p. 1119.) The second detective gave a similar response, and also stated that " '[a]n arrest is not a prosecution . . . .' " (*Id.* at p. 1120.) We explained that, "[o]n its face, defendant's statement was conditional; he wanted a lawyer *if* he was going to be *charged.* The conditional nature of the statement rendered it, at best, ambiguous and equivocal because a reasonable police officer in these circumstances would not necessarily have known whether the condition would be fulfilled since, as these officers explained, the decision to charge is not made by police. Confronted with this statement, a reasonable officer would have understood only that 'the suspect *might* be invoking the right to counsel,' which is insufficient under *Davis* to require cessation of questioning. [Citation.] Here, moreover, the detectives responded to defendant's statement by explaining to him the difference between being arrested and booked and being charged, thus providing him with an opportunity to clarify his meaning, but at no point in this initial exchange did defendant *unequivocally* request the *immediate* presence of an attorney before he would answer any more questions. It is this type of statement *Davis* requires before the police must terminate the interrogation." (*Id.* at p. 1126, citing *Davis v. United States, supra*, 512 U.S. at p. 459, 461-462.)

Defendant attempts to distinguish *Gonzalez* based on the officers' explanation in that case of the difference between booking and charging, which, he asserts, "tend[ed] to show that they truly did not know if he had invoked his rights." He further notes that the defendant's subsequent conduct in *Gonzalez* established that he was not invoking his right to counsel. He contrasts these facts to what he characterizes as Keers's "deceit and trickery to convince [defendant] to keep talking with her." He notes the evidence of which she was aware as the lead

73

investigator — the gray van that matched Whitecloud's description, the matching tire treads, the matching shoe impressions — and concludes that "[a] reasonable officer who knew what Keers knew could only have construed [defendant's] statements as an invocation of his right to counsel. She had evidence linking [defendant] to one murder and, by the line of questioning she pursued over the next several hours, it is obvious that she was deliberately buying time in an effort to keep him talking." Therefore, defendant asserts, Keers "responded deceptively" to his question by stating that he was not being charged "at this time."

The focus of the test, however, is the clarity of the defendant's request, not the particular officer's belief, and there is no requirement that an officer ask clarifying questions. (*Davis v. United States, supra*, 512 U.S. at pp. 459-462.) As we subsequently confirmed, "a defendant does not unambiguously invoke his right to counsel when he makes that request contingent on an event that has not occurred. (See *People v. Gonzalez* (2005) 34 Cal.4th 1111 [defendant's request for counsel was conditioned on whether he was going to be charged with any crimes].)" (*People v. Martinez* (2010) 47 Cal.4th 911, 952.) Moreover, as in *Gonzalez, supra*, 34 Cal.4th 1111, the officer's response in this case provided defendant with an opportunity to clarify his meaning, but as in *Gonzalez*, defendant did not then unequivocally request the presence of an attorney. Instead, he consented to a search of his residence.

Defendant also contends that Keers's failure to inform him of "critical information" and "the severity of his predicament" rendered his waiver of rights under *Miranda* involuntary and unknowing. *Miranda* requires that the person in custody be informed of the right to remain silent, the consequences of forgoing that right, the right to counsel, and that if the person is indigent, a lawyer will be appointed. (*Miranda v. Arizona, supra*, 384 U.S. at pp. 467-473.) There is no requirement that, before a person may validly waive his privilege against self-

74

incrimination, he must be apprised of the evidence against him, the "severity of his predicament," or the chances he will be charged. (*People v. Sanders* (1990) 51 Cal.3d 471, 513.)

Finally, defendant contends his *Miranda* waiver was limited because he "placed a condition on his waiver" when he stated that he thought he needed a lawyer if he was being charged. He asserts that "[a]n 'ordinary understanding of [defendant's] statement requires the conclusion that his consent to waive his rights only existed if he were not being charged with the crime." A person may invoke his *Miranda* rights selectively (*Arnold v. Runnels* (9th Cir. 2005) 421 F.3d 859, 864 [defendant clearly and unequivocally stated that he did not want to speak on tape]), but defendant did not state that he would speak to the detectives without the assistance of counsel only if he would not be charged with the crimes. As explained above, his statement concerning counsel was ambiguous and conditional, and did not constitute an invocation of his right to counsel. He cannot avoid the rule of *Davis v. United States, supra*, 512 U.S. 452, by characterizing an ambiguous reference to counsel as a limitation on his waiver of his *Miranda* rights.

### 3. Admission of photographs of the victims

Defendant contends that a photo board containing photographs of the 13 homicide victims while they were alive should not have been admitted into evidence because it constituted an inappropriate emotional appeal to the jury.

Near the end of the guilt phase, an investigator with the district attorney's office testified concerning an exhibit he had prepared, a four-and-one-half-foot square photo board, containing photographs of the 13 victims defendant was charged with killing. The board included the victims' names along with the dates and approximate locations where their bodies were discovered. The photographs

75

were obtained from the family members and friends of the victims. The investigator attempted to obtain the most recent photograph of each victim, but in some cases the photographs were taken a year or two before the subject's death, and at least one was taken at least five years before the subject's death. The sizes of the photographs vary slightly, but each generally fills an 8 1/2 by 11-inch sheet of paper. All the photographs, save for one, are cropped to show only the victim's head or head and upper body.

Several court days later, at the close of the prosecution's case, defendant objected to admission of the photo board, asserting that the photos "were taken of the victims under the best of all possible circumstances," and arguing that the exhibit was "an emotional appeal. It is abstract or distanced . . . from the nature of the victims that the prosecution has been . . . arguing all along, which is street and drug using prostitutes." The prosecutor responded that the photographs had been obtained from family members, and in some cases there were not many photographs available. He stated that the defense could seek to introduce booking photos of the victims and could fairly comment on the issue in argument. Finally, he asserted that "with this number of victims and the type of evidence that relates to each of these victims, it's important for the jury to identify a name with a face . . . ."

The trial court first addressed the prosecutor's purpose — to assist the jury in keeping track of the victims and evidence — and stated that it was not admitting the photographs exclusively for the purpose of "associating a name with a photograph," which could be done "with other things as well." The court then stated that it would allow their admission, "because [the jurors] can see the similarity between those photographs and those photographs of these women at their worst. It's not because they were put at their worst, someone put them at their worst. And I think it's appropriate to let them see them, these individuals not

76

necessarily at their best, but at least as you and I are seeing them on a daily basis and the jurors in associating or identifying those victims from various parts of our county."**14**

The trial court's comments are not entirely clear, but they appear to reflect that the court recognized that the photographs had some probative value to assist jurors in keeping track of the evidence, but it viewed their value for this purpose as insufficient by itself to warrant their admission. The court did not, however, reject this purpose on the ground that admission of the photographs would cause undue prejudice to defendant. The court's comments also identify a second purpose of the photographs — to show what the victims looked like while alive rather than as they appeared in crime scene and autopsy photographs admitted at trial. Finally, the comments reflect that the trial court rejected defendant's theory of undue prejudice.

"We have recognized that '[c]ourts should be cautious in the guilt phase about admitting photographs of murder victims while alive, given the risk that the photograph will merely generate sympathy for the victims. [Citation.] But the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant. [Citation.] The decision to admit victim photographs

---

**14** The trial court stated in full: "It seems to me that these, and I'm not going to allow it to come in, because for the sake of having 24 photo boards associated with their names and strictly and that exclusively that is associating a name with a photograph, is they can do that with other things as well, so it's not, but I am going to allow it to come in, because they can see the similarity between those photographs and those photographs of these women at their worst. It's not because they were put at their worst, someone put them at their worst. And I think it's appropriate to let them see them, these individuals not necessarily at their best, but at least as you and I are seeing them on a daily basis and the jurors in associating or identifying those victims from various parts of our county. I think it's appropriate and it shall come in."

falls within the trial court's discretion, and an appellate court will not disturb its ruling unless the prejudicial effect of the photographs clearly outweighs their probative value." (*People v. Rogers* (2009) 46 Cal.4th 1136, 1163 (*Rogers*).) Here, the court, in admitting the photos, implicitly determined the photos themselves did not generate sympathy. Our review of the photos is in accord. The photographs are ordinary, with no uniform emotion or quality. In seven, the victims are smiling, and in six, they have blank or sour expressions. The style of photograph is seemingly random, ranging from what appear to be school portraits to "candids" to posed pictures. (See *People v. Hovey* (1988) 44 Cal.3d 543, 571 ["photo, though perhaps 'charming,' was nonetheless an 'ordinary' one not likely to produce a prejudicial impact"].) Due to the manner in which the photographs were cropped, their context is ambiguous, making the portraits appear neutral and detached. (See *People v. Cooper* (1991) 53 Cal.3d 771, 821 [trial court ordered photograph cropped to remove family dogs in order to minimize prejudice]; *People v. Thompson* (1988) 45 Cal.3d 86, 115 [photograph was not "calculated to elicit sympathy," such as a photograph taken at church or with small children].)

Further, as we held in *Rogers,* subsequent to the trial in this matter, photographs may be admitted to assist jurors in keeping track of individuals in a case, if the photographs are not unduly prejudicial. In *Rogers*, the trial court admitted two photographs of the three victims, taken while they were alive. We concluded the trial court did not abuse its discretion, noting that "two of the victims were similar in appearance to two of the witnesses, all four had been girlfriends of defendant, and one victim and one witness had the same first name. Given these circumstances, admission of the photographs was proper to meet the prosecution's concern that the jurors might 'lose track of who these individuals are' and also to help any witness 'identify the people that they saw in this case.' " (*Rogers, supra,* 46 Cal.4th at p. 1163, fns. omitted.)

Similarly, in this case despite the trial court's statement, we find the photo board was useful to assist the jurors in keeping track of the 13 murder charges and the extensive array of evidence associated with the crimes. Also, as in *Rogers, supra*, 46 Cal.4th 1136, the photographs are "neutral and unremarkable and would not have engendered an emotional reaction capable of influencing the verdict." (*Id*. at p. 1163.)

The trial court did not abuse its discretion in concluding the photographs were not unduly prejudicial. Defendant's theory of prejudice is that the photographs aroused the jury's passion because they portrayed the victims more sympathetically than did the prosecutor's description of them as drug-abusing prostitutes. In other words, his argument speculates that the jurors imagined that the victims looked worse in their daily lives than they appear in these photographs, and evidence that the victims looked like ordinary people constitutes prejudice that would weigh against their admission. "For purposes of Evidence Code section 352, evidence is considered unduly prejudicial if it tends to evoke an emotional bias against the defendant as an individual and has a negligible bearing on the issues." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1091.) To the extent the photo board portraying the victims in their daily lives tended to deprive defendant of any perceived advantage he might have gained as a result of jurors' mental images of drug-addicted prostitutes, such alleged detriment is not "undue prejudice" within the meaning of Evidence Code section 352, as this effect cannot be characterized as evoking an emotional bias against defendant.

As we have explained, the photo board was properly admitted. Although the trial court apparently rejected the prosecutor's argument that the exhibit was necessary to assist the jury in keeping track of the evidence, it did not find the photo board unduly prejudicial to defendant. Like the trial court, we have rejected defendant's theory of undue prejudice.

79

## C. Penalty Phase Issues

### 1. *Victim impact evidence*

Defendant contends that the extent and nature of the victim impact evidence deprived him of his rights to due process, a fair trial, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

### a. *Facts*

Defendant moved to exclude all victim impact evidence. The trial court denied the motion, but stated that it could not envision allowing more than three victim impact witnesses per victim, and that it "intend[ed] to keep the proceedings under control . . . ." Thereafter, the prosecution presented 16 victim impact witnesses: three each with respect to McDonald and Zamora, two each with respect to Sternfeld and Casares, and one each with respect to the rest, except no witnesses testified concerning the impact of the murders of Coker and Latham.

Lyttle's father testified concerning her childhood difficulties and his painful memories of her death. Leal's brother described their family and the effect that her death and the manner of her death had on the family. The paternal grandmother of Ferguson's daughter recalled Ferguson's struggles with drug addiction, and the impact her death had on her daughter. Miller's sister described Miller's gentle spirit, her efforts to stop using drugs, her son and grandson, and how difficult it was to tell their mother how she had died. Sternfeld's sister testified that her murder had destroyed Sternfeld's brother and left her feeling angry and cold. Sternfeld's mother stated that Sternfeld had visited her once or twice a day, that her life was "totally different" after the murder, and that her son visited the cemetery at least twice a week. Puckett's sister, who was raising Puckett's three children, testified that Puckett "always rooted for the underdog, and she was always raging against injustices and inequities." Hammond's brother

80

testified that the oldest of Kelly's three children was a teenage girl who was at an age when she needed her mother, and that he wished Kelly could be there to help care for her mother, who had suffered brain damage. McDonald's daughter thought about her all the time, and McDonald's sisters said that McDonald was a good person who would never do anything that would make someone want to "torture her like that." Zamora's mother missed her very much, and had a void in her life. The whole family had always celebrated holidays together, and the family now began each holiday by visiting the cemetery. Casares's daughter missed her mother and wanted to kill herself. Casares's sister testified that Casares was a kind person who helped care for her paralyzed brother, and that "[s]he didn't deserve to die this way."

### b. Analysis

"The Eighth Amendment does not prohibit the admission of evidence showing how a defendant's crimes directly impacted the victim's family, friends, and the community as a whole, unless such evidence is 'so unduly prejudicial' that it results in a trial that is 'fundamentally unfair.' [Citations.] Likewise, under state law, victim impact evidence is admissible as a circumstance of the crime under section 190.3, factor (a), so long as it 'is not so inflammatory as to elicit from the jury an irrational or emotional response untethered to the facts of the case.' " (*People v. Taylor* (2010) 48 Cal.4th 574, 645-646.) Victim impact evidence is admissible to establish the unique loss resulting from a murder and thereby to counteract the defendant's mitigating evidence. (*People v. Garcia* (2011) 52 Cal.4th 706, 751 (*Garcia*).) "The People are entitled to present a ' "complete life histor[y] [of the murder victim] from early childhood to death." ' [Citation.] Such evidence, which typically comes from those who loved the

murder victim, shows 'how they missed having [that person] in their lives.' " (*Ibid.*)

Defendant asserts that the trial court erred in permitting three victim impact witnesses per victim, citing *State v. Muhammad* (N.J. 1996) 678 A.2d 164, 180, which generally limited such witnesses to one per victim. We have rejected such a limitation. (*People v. McKinnon* (2011) 52 Cal.4th 610, 690; *People v. Hartsch* (2010) 49 Cal.4th 472, 509; *People v. Zamudio* (2008) 43 Cal.4th 327, 364.) Here, 16 victim impact witnesses was not excessive, given that there were 12 murder victims. (See *People v. Pearson* (2013) 56 Cal.4th 393, 467 [13 victim impact witnesses was not excessive, given two murders and testimony from three generations of the victims' families].)

Defendant also faults the trial court's three-witness limitation on the ground that this bare limitation failed to address whether the testimony was otherwise admissible. The trial court further stated, however, that it "intend[ed] to keep the proceedings under control," and, following a colloquy in which the trial court explained that testimony concerning a victim's good qualities could relate to a specific impact, defendant stated only that "it has to be directly related to the impact. That's all." During the presentation of victim impact evidence, defendant rarely objected to the families' testimony. On appeal, he cites a few instances of what he characterizes as "cumulative, emotional and inflammatory recitations with virtually no limitations," but he failed to object to most of this evidence.

First, he complains that Zamora's mother gave lengthy and irrelevant narratives. The defense did not object to this testimony while it was being given. Instead, during a subsequent break, defense counsel stated that "with Mrs. Zamora, . . . there were a couple of questions asked that were so narrative, the response was so long in there, I think there was some objectionable hearsay. It's really hard to object in the middle and interrupt her. It's heart-wrenching. I'd ask

the questions be a little bit more specific and not call for long, long narrative answers of that type." The trial court responded that defendant was going to have to object. It added that "this was not a woman that was uncontrollable, either. . . . I don't think it's something I should have intervened in because she's an uncontrollable witness." Defense counsel reiterated that it was difficult to object, but that he would do so the next time. Defendant forfeited this claim by failing to object to the testimony in a timely manner. (Evid. Code, § 353, subd. (a); *People v. Pollock* (2004) 32 Cal.4th 1153, 1181 [failure to object "may not be excused on the ground that a timely objection would be inconvenient or because of concerns about how jurors might perceive the objection"].)

Second, he challenges the admission of photographs, drawings, and a religious poem. After Zamora's mother testified that Zamora's children wrote "I love you" notes at their mother's grave, the court admitted four photographs of two of Zamora's children, writing notes and placing them among the flowers on the grave. Defendant objected that the photographs were irrelevant, unduly prejudicial, and inflammatory. As the trial court noted, however, the children's tradition of writing love notes and leaving them at her grave was evidence of the impact her death had on them. We have upheld the admission of photographs to illustrate victim impact testimony (*People v. Thomas, supra,* 53 Cal.4th at pp. 824-825; *People v. Davis, supra*, 46 Cal.4th at pp. 618-619), and these photographs are not unduly emotional or inflammatory; they simply show the boys, who are smiling broadly in one photograph, writing and leaving notes at a grave. Over hearsay and relevancy objections, Miller's sister read a poem Miller wrote about stumbling and going through hell, but rejecting Satan and "figur[ing] out Jesus is the only true love around." The poem was not offered for the truth of the matter stated, and it contributed to the picture of the victim who was taken from the family by defendant. Similarly, testimony that Miller was a "gentle spirit" was

83

relevant as a description of what the victims lost. Therefore, this evidence was admissible. Defendant did not object to the other items, and therefore has forfeited those challenges.[15]

Third, defendant complains that family members testified about diseases and crimes suffered subsequent to the murders. It is improper for a witness to speculate regarding the effect of a murder on a third person's health (*People v. Abel* (2012) 53 Cal.4th 891, 939; *People v. Brady* (2010) 50 Cal.4th 547, 577-578), but evidence regarding the reasons a person does not testify is admissible "to dispel any potential negative implication that might be drawn from the prosecutor's failure to call him as a witness." (*Brady*, *supra*, at p. 577.) When asked why her mother was not going to testify, McDonald's sister properly testified that her mother "has a heart condition and my youngest sister died. She was in a car accident . . . three years before that, and it's really hard for her." The witness did not connect the reasons her mother could not testify to the murder. (See *People v. Carrington* (2009) 47 Cal.4th 145, 197 [it is improper to comment on a possible connection between the victim's death and the illness or death that prevents victim impact testimony].) To the extent the testimony might have been based on statements made by McDonald's mother regarding why she would not testify, the statements were admissible to establish the mother's state of mind.[16]

---

[15] The other items were pictures drawn by Sternfeld's son, one of his mother as an angel in heaven and one of Jesus crying; a picture, given by Sternfeld to her mother, of Dennis the Menace in his mother's arms, saying that he loved her "all the way up to heaven and way past God"; and a portion of a school essay written by Zamora's 11-year-old niece, in which she recalled the family looking for Zamora, learning she had been murdered, and going to her funeral where everyone was crying.

[16] For the same reason, defendant's hearsay objection to testimony concerning how Puckett felt about her daughters was properly overruled.

(Evid. Code, § 1250.)  For the same reasons, it was proper to admit testimony by Hammond's brother that his father "told me he couldn't bear it.  And he's got bad enough problems taking care of my mom and the kids, and he just wants to remember Kelly as she was."  Defendant did not object to other testimony that he contends connected the murder to a condition of a relative, and therefore has forfeited his additional claims.[17]

Finally, defendant complains that some family members became emotional on the witness stand, and he claims that the victim impact evidence was excessive and "made it likely that emotion improperly overcame reason in the jury's death judgment."  We have reviewed all of the victim impact evidence, and find it to be moderate in both its volume and tone.  It was neither unduly prejudicial nor so inflammatory as to elicit an irrational or emotional decision untethered to the facts. (See *People v. Taylor, supra*, 48 Cal.4th at pp. 645-646.)

---

[17]    Defendant did not object to the following evidence he now challenges on appeal:  (1) Leal's father suffered from cancer, and when Leal was murdered, her father "gave up."  (2) When asked how the death affected his sisters, Hammond's brother identified one of his sisters as having been affected, and then stated that that sister had been raped a year after Kelly's murder, "[a]nd so that's got a lot to do with her."  (3) Hammond's mother became ill and suffered brain damage before Kelly was killed, and had not been told of Kelly's death.  (4) When Miller's sister was asked how Miller's death affected her and her life, she responded in part, "A lot of ways.  I'm under medical care right now since last November.  I kept getting physically sick with respiratory infections, but then the underlying was major depression.  And so I'm still under a doctor's care at this point."

Defendant similarly did not object to the following statements regarding why family members would not testify:  (1) Sternfeld's brother "can't even come down here to see this man in this courtroom."  (2) Miller's son "can't do it.  He hadn't even been able to come to court.  I tried to talk to him again last night about coming and he said that, you know, he will be here in spirit, but he just can't do it. He can't come here.  He is still very upset."  (3) With respect to whether Leal's mother was "able to testify today," Leal's brother responded, "No."

## 2. *General challenges to California's death penalty scheme, jury instructions, and procedures*

We have previously rejected the various challenges raised by defendant to the death penalty scheme, and we are not persuaded that we should reconsider the following conclusions. " 'The California death penalty scheme is not constitutionally defective because it fails to require jury unanimity on the existence of aggravating factors, or because it fails to require proof beyond a reasonable doubt that death is the appropriate penalty, that aggravating factors exist, or that aggravating factors outweigh mitigating factors. [Citation.] The United States Supreme Court's decisions interpreting the right to a jury trial under the federal Constitution (see *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S 584) do not change these conclusions.' " (*People v. Lopez* (2013) 56 Cal.4th 1028, 1083.) Nor is the trial court required to instruct "that a defendant bears no burden of proving, and a jury need not unanimously agree on, mitigating factors." (*People v. Duenas* (2012) 55 Cal.4th 1, 27.) "Indeed, trial courts 'should not instruct the jury regarding any burden of proof or persuasion at the penalty phase.' " (*People v. Linton* (2013) 56 Cal.4th 1146, 1215 (*Linton*); see *People v. DeHoyos* (2013) 57 Cal.4th 79, 149-150 (*DeHoyos*).) In addition, the trial court is not required to instruct the jury regarding a presumption of life. (*People v. Mai* (2013) 57 Cal.4th 986, 1057; *DeHoyos, supra*, at p. 151.)

We have also rejected various challenges to CALJIC No. 8.88, and find no reason to reconsider our conclusions. The instruction "is not impermissibly vague or ambiguous for using the phrase 'so substantial,' nor did it impermissibly fail to inform the jury that it must find death was an appropriate, not just an authorized, penalty. [Citation.] Nor is CALJIC No. 8.88 unconstitutional for failing to require the jury to return a verdict of life should it determine the mitigating circumstances outweigh the aggravating ones. [Citation.] 'Nor is the instruction

86

defective because it fails to convey to jurors that defendant has no burden to persuade them that death is inappropriate.' " (*People v. Jones, supra*, 57 Cal.4th 899, 980; see *Linton*, *supra*, 56 Cal.4th at p. 1211.) Defendant's bare assertion that "the instruction improperly reduced the prosecution's burden of proof below that required by Penal Code section 190.3" does not raise any contention different from those we reject above.

We have also concluded that the absence of a requirement that the jury make written findings regarding aggravating factors does not violate a defendant's federal due process rights, Eighth Amendment rights to meaningful appellate review, equal protection rights, or Sixth Amendment right to trial by jury. (*DeHoyos, supra*, 57 Cal.4th at p. 150; *Linton*, *supra*, 56 Cal.4th at p. 1216; *People v. Lopez, supra,* 56 Cal.4th at p. 1083.)

" 'California's capital sentencing procedures do not violate principles of equal protection of the law on the ground they provide safeguards different from those found in noncapital cases.' " (*DeHoyos, supra*, 57 Cal.4th at p. 151.) We have also rejected defendant's contention that review for intercase proportionality is required by the federal Constitution (*DeHoyos, supra*, at p. 151; *Linton*, *supra*, 56 Cal.4th at p. 1216), as well as his contention that California's death penalty violates international law and evolving standards of decency. (*Mai, supra*, 57 Cal.4th at p. 1058; *Linton*, *supra*, at p. 1217.)

## III.  CONCLUSION

The judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
KENNARD, J.*

_____
\*      Retired Associate Justice of the Supreme Court, assigned by the
Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY LIU, J.**


I join the court's opinion except for its discussion of whether defendant invoked his right to counsel when he said during custodial interrogation, "I need to know, am I being charged with this, because if I'm being charged with this I think I need a lawyer." (Maj. opn., *ante*, at pp. 70–75.) Detective Keers's answer that "at this point, no you're not being charged with this" was misleading, and her subsequent questioning of defendant violated his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

At the time Detective Keers told defendant that he was "not being charged" with these murders, she knew the following: One of the murder victims was last seen entering a "bluish gray" van. Tire tracks at several of the murder scenes were consistent with a vehicle equipped with Yokohama and Uniroyal brand tires. Shoe impressions that could have been made by a Converse shoe were found at one murder scene. When he was arrested, defendant was driving a gray minivan equipped with Yokohama and Uniroyal brand tires. He was wearing Converse shoes. A woman who appeared to be a prostitute had approached the van. Inside the van was a fixed-blade knife that appeared to have blood on it. Detective Keers also found fibers in the carpeting, side upholstery, and seat fabric of the van that were consistent with fibers found at some of the crime scenes. Sisal rope fibers found on or near many of the victims were similar to a sisal rope found in defendant's van.

1

After police stopped him in his van, defendant was arrested, taken to a police station, and advised of his *Miranda* rights. He had been interrogated for more than two hours at the point when Detective Keers asked if he would allow a search of his home. As noted, defendant said, "I need to know, am I being charged with this, because if I'm being charged with this I think I need a lawyer." Detective Keers answered, "Well at this point, no you're not being charged with this." Defendant then consented to a search of his apartment.

Detective Keers was the lead investigator on this case. Given what she knew during the interrogation, she could not have had any doubt that defendant would be charged with these murders. By telling defendant, "Well at this point, no you're not being charged with this," she misled him. As *Miranda* said, "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." (*Miranda*, *supra*, 384 U.S. at p. 476; see *People v. Russo* (1983) 148 Cal.App.3d 1172, 1177 [waiver of *Miranda* rights rendered invalid by detective's statement that " 'If you didn't do this, you don't need a lawyer, you know' "]; *People v. Hinds* (1984) 154 Cal.App.3d 222, 234 (*Hinds*) ["[D]etectives deliberately misled appellant concerning his right against self-incrimination . . . [by] twist[ing] the required advisement: '[A]nything you say doesn't necessarily held [*sic*] against you, it can be held to help you, depending on what happened.' "].)

The statements defendant made during the nearly three hours of questioning following Detective Keers's misleading statement should have been excluded, including his admissions that he had been in the orange groves and had seen a body there. But given the other evidence of defendant's guilt, the *Miranda* violation was harmless beyond a reasonable doubt.

LIU, J.

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Suff

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S049741
**Date Filed:** April 28, 2014

_____

**Court:** Superior
**County:** Riverside
**Judge:** W. Charles Morgan

_____

**Counsel:**

Jeffrey J. Gale, under appointment by the Supreme Court, and Michael J. Hersek, State Public Defender, for Defendant and Appellant.

Edmund G., Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Adrianne S. Denault and Erika Hiramatsu, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Jeffrey J. Gale
5714 Folsom Boulevard, No. 212
Sacramento, CA  95819
(916) 606-8915

Adrianne S. Denault
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2224